# DOWLING v. UNITED STATES

No. 84–589.   Argued April 17, 1985—Decided June 28, 1985

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE, J., joined, *post*, p. 229.

*Michael D. Abzug* argued the cause for petitioner. With him on the brief was *Mary E. Kelly.*

*Carolyn F. Corwin* argued the cause for the United States. With her on the brief were *Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey,* and *Gloria C. Phares.**

JUSTICE BLACKMUN delivered the opinion of the Court.

The National Stolen Property Act provides for the imposition of criminal penalties upon any person who "transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." 18 U. S. C. § 2314. In this case, we must determine whether the statute reaches the interstate transportation of "bootleg" phonorecords, "stolen, converted or taken by fraud" only in the sense that they were manufactured and distributed without the consent of the copyright owners of the musical compositions performed on the records.

## I

After a bench trial in the United States District Court for the Central District of California conducted largely on the basis of a stipulated record, petitioner Paul Edmond Dowling was convicted of one count of conspiracy to transport stolen property in interstate commerce, in violation of 18 U. S. C.

---

**Ernest S. Meyers, Eugene D. Berman, Joel M. Schoenfeld,* and *Roy R. Kulcsar,* filed a brief for the Recording Industry Association of America, Inc., as *amicus curiae* urging affirmance.

§ 371; eight counts of interstate transportation of stolen property, in violation of 18 U. S. C. § 2314; nine counts of copyright infringement, in violation of 17 U. S. C. § 506(a); and three counts of mail fraud, in violation of 18 U. S. C. § 1341.[1] The offenses stemmed from an extensive bootleg record operation involving the manufacture and distribution by mail of recordings of vocal performances by Elvis Presley.[2]  The

---

[1] Only the § 2314 counts concern us here.  Counts Two through Seven of the indictment, referring to the statute, charged:

"On or about the dates listed below and to and from the locations hereinafter specified, defendants THEAKER and DOWLING knowingly and willfully caused to be transported in interstate commerce phonorecords of a value of more than $5,000, containing Elvis Presley performances of copyrighted musical compositions, which phonorecords, as the defendants then and there well knew, were stolen, converted and taken by fraud, in that they were manufactured without the consent of the copyright proprietors." App. 6–7.

A chart then identified six shipments, each from Los Angeles County, Cal., to Baltimore, Md., the first dated January 12, 1979, and the last November 8, 1979.  Id., at 7.  Counts Eight and Nine of the indictment referred to § 2314 and continued:

"On or about the dates listed below and to and from the locations hereinafter specified, defendants THEAKER, DOWLING and MINOR knowingly and willfully caused to be transported in interstate commerce phonorecords of a value of more than $5,000, containing Elvis Presley performances of copyrighted musical compositions, which phonorecords, as the defendants then and there well knew, were stolen, converted and taken by fraud, in that they were manufactured without the consent of the copyright proprietors."  Id., at 7–8.

A chart then identified two shipments, each from Los Angeles County, Cal., to Miami, Fla., the first dated November 8, 1979, and the second June 4, 1979.  Id., at 8.

Dowling's case was severed from that of codefendants William Samuel Theaker and Richard Minor.  Theaker pleaded guilty to six counts of the indictment.  Brief for United States 2, n. 1.  Minor was convicted in a separate trial on all counts naming him, and the United States Court of Appeals for the Ninth Circuit affirmed in all respects.  United States v. Minor, 756 F. 2d 731 (1985).

[2] A "bootleg" phonorecord is one which contains an unauthorized copy of a commercially unreleased performance.  As in this case, the bootleg

evidence demonstrated that sometime around 1976, Dowling, to that time an avid collector of Presley recordings, began in conjunction with codefendant William Samuel Theaker to manufacture phonorecords of unreleased Presley recordings. They used material from a variety of sources, including studio outtakes, acetates, soundtracks from Presley motion pictures, and tapes of Presley concerts and television appearances.[3] Until early 1980, Dowling and Theaker had the records manufactured at a record-pressing company in Burbank,

---

material may come from various sources. For example, fans may record concert performances, motion picture soundtracks, or television appearances. Outsiders may obtain copies of "outtakes," those portions of the tapes recorded in the studio but not included in the "master," that is, the final edited version slated for release after transcription to phonorecords or commercial tapes. Or bootleggers may gain possession of an "acetate," which is a phonorecord cut with a stylus rather than stamped, capable of being played only a few times before wearing out, and utilized to assess how a performance will likely sound on a phonorecord.

Though the terms frequently are used interchangeably, a "bootleg" record is not the same as a "pirated" one, the latter being an unauthorized copy of a performance already commercially released.

[3] See n. 2, *supra*. For example, according to the stipulated testimony of the Presley archivist at RCA Records, which held the exclusive rights to manufacture and distribute sound recordings of Presley performances from early in his career through the time of trial in this case, the "Elvis Presley Dorsey Shows" contained performances from Presley's appearances on a series of six television shows in January, February, and March 1956; "Elvis Presley From the Waist Up" contained performances from three appearances on "The Ed Sullivan Show" in September and October 1956 and January 1957; "Plantation Rock" included a version of the title song recorded from an acetate, which other testimony indicated Dowling had purchased from the author of the song; "The Legend Lives On" included material from unreleased master tapes from the RCA Records inventory; "Rockin' with Elvis New Year's Eve" derived from a recording by an audience member at a 1976 concert in Pittsburgh; and "Elvis on Tour" came from the master tape or the film source of the film of the same name. Stipulation re Testimony of Joan Deary, 2 Record, Doc. No. 109, pp. 24, 25, 35, 37, 40, 44. With the exceptions of "Plantation Rock" and "Elvis on Tour," quantities of each of these albums were included in the shipments giving rise to the § 2314 counts.

Cal. When that company later refused to take their orders, they sought out other record-pressing companies in Los Angeles and, through codefendant Richard Minor, in Miami, Fla. The bootleg entrepreneurs never obtained authorization from or paid royalties to the owners of the copyrights in the musical compositions.[4]

In the beginning, Dowling, who resided near Baltimore, handled the "artistic" end of the operation, contributing his knowledge of the Presley subculture, seeking out and selecting the musical material, designing the covers and labels, and writing the liner notes, while Theaker, who lived in Los Angeles and had some familiarity with the music industry, took care of the business end, arranging for the record pressings, distributing catalogs, and filling orders. In early 1979, however, having come to suspect that the FBI was investigating the west coast operation, Theaker began making shipments by commercial trucking companies of large quantities of the albums to Dowling in Maryland. Throughout 1979 and 1980, the venturers did their marketing through Send Service, a labeling and addressing entity, which distributed at least 50,000 copies of their catalog and advertising flyers to addresses on mailing lists provided by Theaker and Dowling. Theaker would collect customers' orders from post office

---

[4] See Stipulation re Copyrights, Royalties and Licenses, 2 Record, Doc. No. 109, pp. 111–125, and Stipulation re Songs on Albums, 2 Record, Doc. No. 109, pp. 127–145. The Copyright Act requires record manufacturers to obtain licenses and pay royalties to copyright holders upon pressing records that contain performances of copyrighted musical compositions. 17 U. S. C. § 115.

While motion-picture copyrights protect the soundtracks of Presley's movies, Congress did not extend federal copyright protection to sound recordings until the Sound Recording Act of 1971, Pub. L. 92–140, 85 Stat. 391, and then only to sound recordings fixed after February 15, 1972. See *Goldstein* v. *California*, 412 U. S. 546, 551–552 (1973). Therefore, most of the sound recordings involved in this case, as opposed to the musical compositions performed, are apparently not protected by copyright. In any event, the § 2314 counts rely solely on infringement of copyrights to musical compositions. See n. 1, *supra*.

boxes in Glendale, Cal., and mail them to Dowling in Maryland, who would fill the orders. The two did a substantial business: the stipulated testimony establishes that throughout this period Dowling mailed several hundred packages per week and regularly spent $1,000 per week in postage. The men also had occasion to make large shipments from Los Angeles to Minor in Miami, who purchased quantities of their albums for resale through his own channels.

The eight § 2314 counts on which Dowling was convicted arose out of six shipments of bootleg phonorecords from Los Angeles to Baltimore and two shipments from Los Angeles to Miami. See n. 1, *supra*. The evidence established that each shipment included thousands of albums, that each album contained performances of copyrighted musical compositions for the use of which no licenses had been obtained nor royalties paid, and that the value of each shipment attributable to copyrighted material exceeded the statutory minimum.

Dowling appealed from all the convictions save those for copyright infringement, and the United States Court of Appeals for the Ninth Circuit affirmed in all respects. 739 F. 2d 1445 (1984). As to the charges under § 2314, the court relied on its decision in *United States* v. *Belmont*, 715 F. 2d 459 (1983), cert. denied, 465 U. S. 1022 (1984), where it had held that interstate transportation of videotape cassettes containing unauthorized copies of copyrighted motion pictures involved stolen goods within the meaning of the statute.[5] As in *Belmont*, the court reasoned that the rights of copyright owners in their protected property were indistinguishable from ownership interests in other types of property and were equally deserving of protection under the statute. 739 F. 2d, at 1450, quoting 715 F. 2d, at 461–462.

---

[5] See also *United States* v. *Atherton*, 561 F. 2d 747, 752 (CA9 1977) (motion pictures); *United States* v. *Drebin*, 557 F. 2d 1316, 1328 (CA9 1977) (motion pictures), cert. denied, 436 U. S. 904 (1978); *United States* v. *Minor*, 756 F. 2d 731 (CA9 1985) (sound recordings).

We granted certiorari to resolve an apparent conflict among the Circuits[6] concerning the application of the statute to interstate shipments of bootleg and pirated sound recordings and motion pictures whose unauthorized distribution infringed valid copyrights. 469 U. S. 1157 (1985).

## II

Federal crimes, of course, "are solely creatures of statute." *Liparota* v. *United States*, 471 U. S. 419, 424 (1985), citing *United States* v. *Hudson*, 7 Cranch 32 (1812). Accordingly, when assessing the reach of a federal criminal statute, we must pay close heed to language, legislative history, and purpose in order strictly to determine the scope of the conduct the enactment forbids. Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a "narrow interpretation" appropriate. See *Williams* v. *United States*, 458 U. S. 279, 290 (1982). Chief Justice Marshall early observed:

> "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of

---

[6] In *United States* v. *Smith*, 686 F. 2d 234 (CA5 1982), the court held that interstate transportation of unauthorized copies of copyrighted motion pictures recorded "off the air" during television broadcasting did not fall within the reach of § 2314. The other courts which have addressed the issue have either agreed with the Ninth Circuit that interstate transportation of copies of infringing motion pictures and sound recordings comes within the statute, or assumed the same. See *United States* v. *Drum*, 733 F. 2d 1503, 1505–1506 (CA11) (sound recordings), cert. denied, 469 U. S. 1061 (1984); *United States* v. *Gottesman*, 724 F. 2d 1517, 1519–1521 (CA11 1984) (motion pictures); *United States* v. *Whetzel*, 191 U. S. App. D. C. 184, 187, n. 10, 589 F. 2d 707, 710, n. 10 (1978) (sound recordings); *United States* v. *Berkwitt*, 619 F. 2d 649, 656–658 (CA7 1980) (sound recordings); *United States* v. *Gallant*, 570 F. Supp. 303, 310–314 (SDNY 1983) (sound recordings); *United States* v. *Sam Goody, Inc.*, 506 F. Supp. 380, 385–391 (EDNY 1981) (sound recordings). See also *United States* v. *Steerwell Leisure Corp.*, 598 F. Supp. 171, 174 (WDNY 1984) (video games).

individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States* v. *Wiltberger*, 5 Wheat. 76, 95 (1820).

Thus, the Court has stressed repeatedly that " ' "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." ' " *Williams* v. *United States*, 458 U. S., at 290, quoting *United States* v. *Bass*, 404 U. S. 336, 347 (1971), which in turn quotes *United States* v. *Universal C. I. T. Credit Corp.*, 344 U. S. 218, 221–222 (1952).

## A

Applying that prudent rule of construction here, we examine at the outset the statutory language. Section 2314 requires, first, that the defendant have transported "goods, wares, [or] merchandise" in interstate or foreign commerce; second, that those goods have a value of "$5,000 or more"; and, third, that the defendant "kno[w] the same to have been stolen, converted or taken by fraud." Dowling does not contest that he caused the shipment of goods in interstate commerce, or that the shipments had sufficient value to meet the monetary requirement. He argues, instead, that the goods shipped were not "stolen, converted or taken by fraud." In response, the Government does not suggest that Dowling wrongfully came by the phonorecords actually shipped or the physical materials from which they were made; nor does it contend that the objects that Dowling caused to be shipped, the bootleg phonorecords, were "the same" as the copyrights in the musical compositions that he infringed by unauthorized distribution of Presley performances of those compositions. The Government argues, however, that the shipments come within the reach of § 2314 because the phonorecords physi-

cally embodied performances of musical compositions that Dowling had no legal right to distribute. According to the Government, the unauthorized use of the musical compositions rendered the phonorecords "stolen, converted or taken by fraud" within the meaning of the statute.[7] We

---

[7] The Government argues in the alternative that even if the unauthorized use of copyrighted musical compositions does not alone render the phonorecords contained in these shipments "stolen, converted or taken by fraud," the record contains evidence amply establishing that the bootleggers obtained the source material through illicit means. The Government points to testimony, for example, that the custodians of the tapes containing the outtakes which found their way onto Dowling's records neither authorized their release nor permitted access to them by unauthorized persons. App. 22–23, 34, 38–39, 42–43, 46. According to the Government, the wrongfully obtained tapes which contained the musical material should be considered "the same" as the phonorecords onto which the sounds were transferred, which were therefore "stolen, converted or taken by fraud" within the meaning of § 2314. Cf. *United States* v. *Bottone*, 365 F. 2d 389 (CA2), cert. denied, 385 U. S. 974 (1966).

For several reasons, we decline to consider this alternative basis for upholding Dowling's convictions. The § 2314 counts in the indictment were founded exclusively on the allegations that the shipped phonorecords, which contained "Elvis Presley performances of copyrighted musical compositions," were "stolen, converted and taken by fraud, in that they were manufactured without the consent of the copyright proprietors." See n. 1, *supra*. The decision of the Court of Appeals does not rely on any theory of illegal procurement; it rests solely on a holding that "Dowling's unauthorized sale of phonorecords of copyrighted material clearly involved 'goods, wares or merchandise' within the meaning of the statute." 739 F. 2d 1445, 1450–1451 (CA9 1984). Moreover, even assuming that the stipulated testimony contained sufficient evidence to establish the unlawful procurement of the source material, the Government made no attempt in the District Court to address the difficult problems of valuation under its alternative theory. For example, it introduced no evidence that might have established the value of the tapes allegedly stolen from the RCA archives, nor how that value might relate to the value of the goods ultimately shipped. Instead, its evidence concerning the value of the interstate shipments of records attempted to isolate the value attributable to the copyrighted musical compositions. App. 24–33. Under these circumstances, we assess the validity of Dowling's convictions only under the allegations made in the indictment.

must determine, therefore, whether phonorecords that include the performance of copyrighted musical compositions for the use of which no authorization has been sought nor royalties paid are consequently "stolen, converted or taken by fraud" for purposes of § 2314. We conclude that they are not.

The courts interpreting § 2314 have never required, of course, that the items stolen and transported remain in entirely unaltered form. See, *e. g., United States* v. *Moore,* 571 F. 2d 154, 158 (CA3) (counterfeit printed Ticketron tickets "the same" as stolen blanks from which they were printed), cert. denied, 435 U. S. 956 (1978). Nor does it matter that the item owes a major portion of its value to an intangible component. See, *e. g., United States* v. *Seagraves,* 265 F. 2d 876 (CA3 1959) (geophysical maps identifying possible oil deposits); *United States* v. *Greenwald,* 479 F. 2d 320 (CA6) (documents bearing secret chemical formulae), cert. denied, 414 U. S. 854 (1973). But these cases and others prosecuted under § 2314 have always involved physical "goods, wares, [or] merchandise" that have themselves been "stolen, converted or taken by fraud." This basic element comports with the common-sense meaning of the statutory language: by requiring that the "goods, wares, [or] merchandise" be "the same" as those "stolen, converted or taken by fraud," the provision seems clearly to contemplate a physical identity between the items unlawfully obtained and those eventually transported, and hence some prior physical taking of the subject goods.

In contrast, the Government's theory here would make theft, conversion, or fraud equivalent to wrongful appropriation of statutorily protected rights in copyright. The copyright owner, however, holds no ordinary chattel. A copyright, like other intellectual property, comprises a series of carefully defined and carefully delimited interests to which the law affords correspondingly exact protections. "Section 106 of the Copyright Act confers a bundle of exclusive rights

to the owner of the copyright," which include the rights "to publish, copy, and distribute the author's work." *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 539, 546–547 (1985). See 17 U. S. C. § 106. However, "[t]his protection has never accorded the copyright owner complete control over all possible uses of his work." *Sony Corp.* v. *Universal City Studios, Inc.*, 464 U. S. 417, 432 (1984); *id.*, at 462–463 (dissenting opinion). For example, § 107 of the Copyright Act "codifies the traditional privilege of other authors to make 'fair use' of an earlier writer's work." *Harper & Row, supra*, at 547. Likewise, § 115 grants compulsory licenses in nondramatic musical works. Thus, the property rights of a copyright holder have a character distinct from the possessory interest of the owner of simple "goods, wares, [or] merchandise," for the copyright holder's dominion is subjected to precisely defined limits.

It follows that interference with copyright does not easily equate with theft, conversion, or fraud. The Copyright Act even employs a separate term of art to define one who misappropriates a copyright: "'Anyone who violates any of the exclusive rights of the copyright owner,' that is, anyone who trespasses into his exclusive domain by using or authorizing the use of the copyrighted work in one of the five ways set forth in the statute, 'is an infringer of the copyright.' [17 U. S. C.] § 501(a)." *Sony Corp., supra*, at 433. There is no dispute in this case that Dowling's unauthorized inclusion on his bootleg albums of performances of copyrighted compositions constituted infringement of those copyrights. It is less clear, however, that the taking that occurs when an infringer arrogates the use of another's protected work comfortably fits the terms associated with physical removal employed by § 2314. The infringer invades a statutorily defined province guaranteed to the copyright holder alone. But he does not assume physical control over the copyright; nor does he wholly deprive its owner of its use. While one may colloquially link infringement with some general notion of wrong-

ful appropriation, infringement plainly implicates a more complex set of property interests than does run-of-the-mill theft, conversion, or fraud. As a result, it fits but awkwardly with the language Congress chose—"stolen, converted or taken by fraud"—to describe the sorts of goods whose interstate shipment § 2314 makes criminal.[8] "And, when interpreting a criminal statute that does not explicitly reach the conduct in question, we are reluctant to base an expansive reading on inferences drawn from subjective and variable 'understandings.'" *Williams* v. *United States*, 458 U. S., at 286.

## B

In light of the ill-fitting language, we turn to consider whether the history and purpose of § 2314 evince a plain congressional intention to reach interstate shipments of goods infringing copyrights. Our examination of the background of the provision makes more acute our reluctance to read § 2314 to encompass merchandise whose contraband character derives from copyright infringement.

Congress enacted § 2314 as an extension of the National Motor Vehicle Theft Act, ch. 89, 41 Stat. 324, currently codified at 18 U. S. C. § 2312. Passed in 1919, the earlier

---

[8] The dissent relies on *United States* v. *Turley*, 352 U. S. 407 (1957), and *Morissette* v. *United States*, 342 U. S. 246 (1952), to give § 2314 a "very broad" reading. *Post*, at 231–232. In *Turley*, after considering the purpose of the National Motor Vehicle Theft Act to combat interstate transportation of feloniously taken vehicles, the Court rejected an interpretation of "stolen" which would have limited that term to common-law larceny. 352 U. S., at 417. Similarly, in *Morissette*, in considering the language of 18 U. S. C. § 641 providing that "[w]hoever embezzles, steals, purloins, or knowingly converts" Government property be subject to specified penalties, the Court pointed out that conversion extends beyond the common-law definition of stealing. 342 U. S., at 271–272. Neither *Turley* nor *Morissette* involved copyright law specifically or intellectual property in general; neither, therefore, sheds light on the particular problems presented by this case. See Parts II–B through II–D, *infra*.

Act was an attempt to supplement the efforts of the States to combat automobile thefts. Particularly in areas close to state lines,[9] state law enforcement authorities were seriously hampered by car thieves' ability to transport stolen vehicles beyond the jurisdiction in which the theft occurred.[10] Legislating pursuant to its commerce power,[11] Congress made unlawful the interstate transportation of stolen vehicles, thereby filling in the enforcement gap by "strik[ing] down State lines which serve as barriers to protect [these interstate criminals] from justice." 58 Cong. Rec. 5476 (1919) (statement of Rep. Newton).[12]

Congress acted to fill an identical enforcement gap when in 1934 it "extend[ed] the provisions of the National Motor Vehicle Theft Act to other stolen property" by means of the National Stolen Property Act. Act of May 22, 1934, 48

[9] See 58 Cong. Rec. 5472 (1919) (statement of Rep. Reavis); *id.*, at 5474 (statement of Rep. Bee).

[10] See *id.*, at 5471 (statement of Rep. Dyer) ("State laws upon the subject have been inadequate to meet the evil. Thieves steal automobiles and take them from one State to another and ofttimes have associates in this crime who receive and sell the stolen machines").

[11] See, *e. g., id.*, at 5471–5472 (statement of Rep. Dyer); *id.*, at 5475–5476 (statement of Rep. Newton).

[12] This Court has explained:

"By 1919, the law of most States against local theft had developed so as to include not only common-law larceny but embezzlement, false pretenses, larceny by trick, and other types of wrongful taking. The advent of the automobile, however, created a new problem with which the States found it difficult to deal. The automobile was uniquely suited to felonious taking whether by larceny, embezzlement or false pretenses. It was a valuable, salable article which itself supplied the means for speedy escape. 'The automobile [became] the perfect chattel for modern large-scale theft.' This challenge could be best met through use of the Federal Government's jurisdiction over interstate commerce. The need for federal action increased with the number, distribution and speed of the motor vehicles until, by 1919, it became a necessity. The result was the National Motor Vehicle Theft Act." *United States* v. *Turley*, 352 U. S., at 413–414 (footnote omitted).

Stat. 794. See S. Rep. No. 538, 73d Cong., 2d Sess., 1 (1934); H. R. Rep. No. 1462, 73d Cong., 2d Sess., 1 (1934); H. R. Conf. Rep. No. 1599, 73d Cong., 2d Sess., 1, 3 (1934). Again, Congress acted under its commerce power to assist the States' efforts to foil the "roving criminal," whose movement across state lines stymied local law enforcement officials. 78 Cong. Rec. 2947 (1934) (statement of Attorney General Cummings).[13] As with its progenitor, Congress responded in the National Stolen Property Act to "the need for federal action" in an area that normally would have been left to state law. *United States* v. *Turley*, 352 U. S. 407, 417 (1957).

No such need for supplemental federal action has ever existed, however, with respect to copyright infringement, for the obvious reason that Congress always has had the bestowed authority to legislate directly in this area. Article I, § 8, cl. 8, of the Constitution provides that Congress shall have the power

> "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

By virtue of the explicit constitutional grant, Congress has the unquestioned authority to penalize directly the distribution of goods that infringe copyright, whether or not those goods affect interstate commerce. Given that power, it is

---

[13] The Attorney General explained: "These criminals have made full use of the improved methods of transportation and communication, and have taken advantage of the limited jurisdiction possessed by State authorities in pursuing fugitive criminals, and of the want of any central coordinating agency acting on behalf of all of the States. In pursuing this class of offenders, almost inevitably breakdown of law enforcement results from this want of some coordinating and centralized law enforcement agency. . . . [T]he territorial limitations on [local law enforcement authorities'] jurisdiction prevent them from adequately protecting their citizens from this type of criminal." 78 Cong. Rec. 2947 (1934).

implausible to suppose that Congress intended to combat the problem of copyright infringement by the circuitous route hypothesized by the Government. See *United States* v. *Smith*, 686 F. 2d 234, 246 (CA5 1982). Of course, the enactment of criminal penalties for copyright infringement would not prevent Congress from choosing as well to criminalize the interstate shipment of infringing goods. But in dealing with the distribution of such goods, Congress has never thought it necessary to distinguish between intrastate and interstate activity. Nor does any good reason to do so occur to us. In sum, the premise of § 2314—the need to fill with federal action an enforcement chasm created by limited state jurisdiction—simply does not apply to the conduct the Government seeks to reach here.

C

The history of copyright infringement provisions affords additional reason to hesitate before extending § 2314 to cover the interstate shipments in this case. Not only has Congress chiefly relied on an array of civil remedies to provide copyright holders protection against infringement, see 17 U. S. C. §§ 502–505, but in exercising its power to render criminal certain forms of copyright infringement, it has acted with exceeding caution.

The first full-fledged criminal provisions appeared in the Copyright Act of 1909, and specified that misdemeanor penalties of up to one year in jail or a fine between $100 and $1,000, or both, be imposed upon "any person who willfully and for profit" infringed a protected copyright.[14] This provision

---

[14] Act of Mar. 4, 1909, § 28, 35 Stat. 1082. Interestingly, however, the 1909 Act did not extend criminal liability to infringement by unauthorized mechanical reproduction of copyrighted musical compositions subject to compulsory licensing, the category of infringement underlying the § 2314 counts here. See § 25(e), 35 Stat. 1081. Congress did not remove this bar until the Sound Recording Act of 1971, Pub. L. 92–140, 85 Stat. 391, which, while for the first time extending federal copyright coverage to sound recordings, see n. 4, *supra*, also made willful infringement of copyright in

was little used. In 1974, however, Congress amended the section, by then 17 U. S. C. § 104 (1976 ed.) by the 1947 revision,[15] substantially to increase penalties for record piracy.[16] The new version retained the existing language, but supplemented it with a new subsection (b), which provided that one who "willfully and for profit" infringed a copyright in sound recordings would be subject to a fine of up to $25,000 or imprisonment for up to one year, or both. 17 U. S. C. § 104(b) (1976 ed.).[17] The legislative history demonstrates that in increasing the penalties available for this category of infringement, Congress carefully calibrated the penalty to the problem: it had come to recognize that "record piracy is so profitable that ordinary penalties fail to deter prospective offenders." H. R. Rep. No. 93–1581, p. 4 (1974). Even so, because it considered record piracy primarily an economic offense, Congress, after serious consideration, rejected a proposal to increase the available term of imprisonment to three years for a first offense and seven years for a subsequent offense. *Ibid.*

---

musical compositions subject to the general criminal provision. See 85 Stat. 392.

Congress first provided criminal penalties for copyright infringement in the Act of Jan. 6, 1897, 29 Stat. 481, which made a misdemeanor, punishable by imprisonment for one year, of the unlawful performance or presentation, done willfully and for profit, of a copyrighted dramatic or musical composition. See also Act of May 31, 1790, § 2, 1 Stat. 124 (fixed civil penalties, one-half payable to the United States, for unauthorized copying of copyrighted book, chart, or map). See generally Young, Criminal Copyright Infringement and a Step Beyond, reprinted in 30 ASCAP Copyright Law Symposium 157 (1983); Gawthrop, An Inquiry Into Criminal Copyright Infringement, reprinted in 20 ASCAP Copyright Law Symposium 154 (1972).

[15] Act of July 30, 1947, ch. 391, 61 Stat. 652.

[16] Act of Dec. 31, 1974, Pub. L. 93–573, 88 Stat. 1873.

[17] A second violation subjected the offender to a fine of up to $50,000 or imprisonment for not more than two years, or both. 17 U. S. C. § 104(b) (1976 ed.). See H. R. Rep. No. 93–1581, p. 4 (1974).

When in 1976, after more than 20 years of study, Congress adopted a comprehensive revision of the Copyright Act, see *Mills Music, Inc.* v. *Snyder*, 469 U. S. 153, 159–161 (1985); *Sony Corp.*, 464 U. S., at 462–463, n. 9 (dissenting opinion), it again altered the scope of the criminal infringement actions, albeit cautiously. Section 101 of the new Act provided:

> "Any person who infringes a copyright willfully and for purposes of commercial advantage or private financial gain shall be fined not more than $10,000 or imprisoned for not more than one year, or both: *Provided, however,* That any person who infringes willfully and for purposes of commercial advantage or private financial gain the copyright in a sound recording afforded by subsections (1), (2), or (3) of section 106 or the copyright in a motion picture afforded by subsections (1), (3), or (4) of section 106 shall be fined not more than $25,000 or imprisoned for not more than one year, or both, for the first such offense and shall be fined not more than $50,000 or imprisoned for not more than two years, or both, for any subsequent offense." 17 U. S. C. § 506(a) (1976 ed., Supp. V).

Two features of this provision are noteworthy: first, Congress extended to motion pictures the enhanced penalties applicable by virtue of prior § 104 to infringement of rights in sound recordings; and, second, Congress recited the infringing uses giving rise to liability. It is also noteworthy that despite the urging of representatives of the film industry, see Copyright Law Revision: Hearings on H. R. 2223 before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 94th Cong., 1st Sess., 716 (1975) (statement of Jack Valenti, president of the Motion Picture Association of America, Inc.), and the initial inclination of the Senate,

see S. Rep. No. 94–473, p. 146 (1975), Congress declined once again to provide felony penalties for copyright infringement involving sound recordings and motion pictures.

Finally, by the Piracy and Counterfeiting Amendments Act of 1982, Pub. L. 97–180, 96 Stat. 91, Congress chose to address the problem of bootlegging and piracy of records, tapes, and films by imposing felony penalties on such activities. Section 5 of the 1982 Act revised 17 U. S. C. § 506(a) to provide that "[a]ny person who infringes a copyright willfully and for purposes of commercial advantage or private financial gain shall be punished as provided in section 2319 of title 18." Section 2319(b)(1), in turn, was then enacted to provide for a fine of up to $250,000, or imprisonment of up to five years, or both, if the offense "involves the reproduction or distribution, during any one-hundred-and-eighty-day period, of at least one thousand phonorecords or copies infringing the copyright in one or more sound recordings [or] at least sixty-five copies infringing the copyright in one or more motion pictures or other audiovisual works." Subsection (b)(2) provides for a similar fine and up to two years' imprisonment if the offense involves "more than one hundred but less than one thousand phonorecords or copies infringing the copyright in one or more sound recordings [or] more than seven but less than sixty-five copies infringing the copyright in one or more motion pictures or other audiovisual works." And subsection (b)(3) provides for a fine of not more than $25,000 and up to one year's imprisonment in any other case of willful infringement. The legislative history indicates that Congress set out from a belief that the existing misdemeanor penalties for copyright infringement were simply inadequate to deter the enormously lucrative activities of large-scale bootleggers and pirates. See 128 Cong. Rec. 9158–9159 (1982) (remarks of Rep. Kastenmeier); The Piracy and Counterfeiting Amendments Act of 1981: Hearings on S. 691 before the Subcommittee on Criminal Law of the Senate Committee on the Judiciary, 97th Cong., 1st Sess., 8 (1981) (statement of Renee

L. Szybala, Special Assistant to the Associate Attorney General). Accordingly, it acted to "strengthen the laws against record, tape, and film piracy" by "increas[ing] the penalties . . . for copyright infringements involving such products," thereby "bring[ing] the penalties for record and film piracy . . . into line with the enormous profits which are being reaped from such activities." S. Rep. No. 97–274, pp. 1, 7 (1981).[18]

Thus, the history of the criminal infringement provisions of the Copyright Act reveals a good deal of care on Congress' part before subjecting copyright infringement to serious criminal penalties. First, Congress hesitated long before imposing felony sanctions on copyright infringers. Second, when it did so, it carefully chose those areas of infringement that required severe response—specifically, sound recordings and motion pictures—and studiously graded penalties even in those areas of heightened concern. This step-by-step, carefully considered approach is consistent with Congress' traditional sensitivity to the special concerns implicated by the copyright laws.

In stark contrast, the Government's theory of this case presupposes a congressional decision to bring the felony provisions of § 2314, which make available the comparatively light fine of not more than $10,000 but the relatively harsh

---

[18] The Act also substantially increased penalties for trafficking in counterfeit labels affixed to sound recordings, motion pictures, and other audiovisual works. 18 U. S. C. § 2318.

The dissent suggests that by providing that the new penalties "shall be in addition to any other provisions of Title 17 or any other law," 18 U. S. C. § 2319(a), Congress "implicitly" approved the interpretation of § 2314 urged by the Government. *Post,* at 233. Neither the text nor the legislative history of either the 1982 Act or earlier copyright legislation evidences any congressional awareness, let alone approval, of the use of § 2314 in prosecutions like the one now before us. In the absence of any such indication, we decline to read the general language appended to § 2319(a) impliedly to validate extension of § 2314 in a manner otherwise unsupported by its language and purpose.

term of imprisonment of up to 10 years, to bear on the distribution of a sufficient quantity of *any* infringing goods simply because of the presence here of a factor—interstate transportation—not otherwise thought relevant to copyright law. The Government thereby presumes congressional adoption of an indirect but blunderbuss solution to a problem treated with precision when considered directly. To the contrary, the discrepancy between the two approaches convinces us that Congress had no intention to reach copyright infringement when it enacted § 2314.

## D

The broad consequences of the Government's theory, both in the field of copyright and in kindred fields of intellectual property law, provide a final and dispositive factor against reading § 2314 in the manner suggested. For example, in *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 539 (1985), this Court very recently held that The Nation, a weekly magazine of political commentary, had infringed former President Ford's copyright in the unpublished manuscript of his memoirs by verbatim excerpting of some 300 words from the work. It rejected The Nation's argument that the excerpting constituted fair use. Presented with the facts of that case as a hypothetical at oral argument in the present litigation, the Government conceded that its theory of § 2314 would permit prosecution of the magazine if it transported copies of sufficient value across state lines. Tr. of Oral Arg. 35. Whatever the wisdom or propriety of The Nation's decision to publish the excerpts, we would pause, in the absence of any explicit indication of congressional intention, to bring such conduct within the purview of a criminal statute making available serious penalties for the interstate transportation of goods "stolen, converted or taken by fraud."

Likewise, the field of copyright does not cabin the Government's theory, which would as easily encompass the law of patents and other forms of intellectual property. If "the

intangible idea protected by the copyright is effectively made tangible by its embodiment upon the tapes," *United States* v. *Gottesman*, 724 F. 2d 1517, 1520 (CA11 1984), phonorecords, or films shipped in interstate commerce as to render those items stolen goods for purposes of § 2314, so too would the intangible idea protected by a patent be made tangible by its embodiment in an article manufactured in accord with patented specifications. Thus, as the Government as much as acknowledged at argument, Tr. of Oral Arg. 29, its view of the statute would readily permit its application to interstate shipments of patent-infringing goods. Despite its undoubted power to do so, however, Congress has not provided criminal penalties for distribution of goods infringing valid patents.[19] Thus, the rationale supporting application of the statute under the circumstances of this case would equally justify its use in wide expanses of the law which Congress has evidenced no intention to enter by way of criminal sanction.[20] This factor militates strongly against the reading proffered by the Government. Cf. *Williams* v. *United States*, 458 U. S., at 287.

---

[19] Congress instead has relied on provisions affording patent owners a civil cause of action. 35 U. S. C. §§ 281–294. Among the available remedies are treble damages for willful infringement. § 284; see, *e. g.*, *American Safety Table Co.* v. *Schreiber*, 415 F. 2d 373, 378–379 (CA2 1969), cert. denied, 396 U. S. 1038 (1970). See generally 2 P. Rosenberg, Patent Law Fundamentals § 17.08 (2d ed. 1985). The only criminal provision relating to patents is 18 U. S. C. § 497, which proscribes the forgery, counterfeiting, or false alteration of letters patent, or the uttering thereof. See also 35 U. S. C. § 292 ($500 penalty, one-half to go to person suing and one-half to the United States, for false marking of patent status).

[20] The Government's rationale would also apply to goods infringing trademark rights. Yet, despite having long and extensively legislated in this area, see federal Trademark Act of 1946 (Lanham Act), 15 U. S. C. § 1051 *et seq.*, in the modern era Congress only recently has resorted to criminal sanctions to control trademark infringement. See Trademark Counterfeiting Act of 1984, Pub. L. 98–473, ch. XV, 98 Stat. 2178. · See also S. Rep. No. 98–526, pp. 1–2, 5 (1984); 2 J. McCarthy, Trademarks and Unfair Competition § 30:39 (2d ed. 1984).

## III

No more than other legislation do criminal statutes take on straitjackets upon enactment. In sanctioning the use of § 2314 in the manner urged by the Government here, the Courts of Appeals understandably have sought to utilize an existing and readily available tool to combat the increasingly serious problem of bootlegging, piracy, and copyright infringement. Nevertheless, the deliberation with which Congress over the last decade has addressed the problem of copyright infringement for profit, as well as the precision with which it has chosen to apply criminal penalties in this area, demonstrates anew the wisdom of leaving it to the legislature to define crime and prescribe penalties.[21] Here, the language of § 2314 does not "plainly and unmistakably" cover petitioner Dowling's conduct, *United States* v. *Lacher*, 134 U. S. 624, 628 (1890); the purpose of the provision to fill gaps in state law enforcement does not couch the problem under attack; and the rationale employed to apply the statute to

---

[21] Indeed, in opposing the petition for a writ of certiorari in this case, the Government acknowledged that it no longer needs § 2314 to prosecute and punish serious copyright infringement. Adverting to the most recent congressional copyright action, it advised the Court:

"[A]pplication of Section 2314 . . . to the sort of conduct involved in this case is of considerably diminished significance since passage, subsequent to the offenses involved in this case, of the Piracy and Counterfeiting Amendments Act of 1982, Pub. L. No. 97–180, 96 Stat. 91 *et seq.* (codified at 17 U. S. C. 506(a) and 18 U. S. C. 2318, 2319). The new statute provides for felony treatment for most serious cases of copyright infringement involving sound recordings and audiovisual materials and trafficking in counterfeit labels, while prior law provided only for misdemeanor treatment for first offenses under the copyright statutes. In view of the increased penalties provided under the new statute, prosecutors are likely to have less occasion to invoke other criminal statutes in connection with copyright infringing activity." Brief in Opposition 8.

These observations suggest the conclusion we have reached—that § 2314 was not in the first place the proper means by which to counter the spread of copyright infringement in sound recordings and motion pictures.

petitioner's conduct would support its extension to significant bodies of law that Congress gave no indication it intended to touch. In sum, Congress has not spoken with the requisite clarity. Invoking the "time-honored interpretive guideline" that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity,'" *Liparota* v. *United States*, 471 U. S., at 427, quoting *Rewis* v. *United States*, 401 U. S. 808, 812 (1971), we reverse the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE WHITE join, dissenting.

The Court holds today that 18 U. S. C § 2314 does not apply to this case because the rights of a copyright holder are "different" from the rights of owners of other kinds of property. The Court does not explain, however, how the differences it identifies are relevant either under the language of § 2314 or in terms of the purposes of the statute. Because I believe that the language of § 2314 fairly covers the interstate transportation of goods containing unauthorized use of copyrighted material, I dissent.

Section 2314 provides for criminal penalties against any person who "transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." There is no dispute that the items Dowling transported in interstate commerce— bootleg Elvis Presley records—are goods, wares, or merchandise. Nor is there a dispute that the records contained copyrighted Elvis Presley performances that Dowling had no right to reproduce and distribute. The only issue here is whether the unauthorized use of a copyright may be "equate[d] with theft, conversion, or fraud" for purposes of § 2314. *Ante,* at 217. Virtually every court that has considered the question has concluded that § 2314 is broad

enough to cover activities such as Dowling's.   See, *e. g.*, *United States* v. *Drum*, 733 F. 2d 1503, 1505–1506 (CA11), cert. denied, 469 U. S. 1061 (1984); *United States* v. *Whetzel*, 191 U. S. App. D. C. 184, 187, n. 10, 589 F. 2d 707, 710, n. 10 (1978); *United States* v. *Berkwitt*, 619 F. 2d 649, 656–658 (CA7 1980); *United States* v. *Sam Goody, Inc.*, 506 F. Supp. 380, 385–391 (EDNY 1981).   The only case cited by the Court that lends support to its holding is *United States* v. *Smith*, 686 F. 2d 234 (CA5 1982).[1]   The Court's decision today is thus contrary to the clear weight of authority.

The Court focuses on the fact that "[t]he copyright owner . . . holds no ordinary chattel."   *Ante*, at 216.   The Court quite correctly notes that a copyright is "comprise[d] . . . of carefully defined and carefully delimited interests," *ibid.*, and that the copyright owner does not enjoy " 'complete control over all possible uses of his work,' " *ante*, at 217, quoting *Sony Corp.* v. *Universal City Studios, Inc.*, 464 U. S. 417, 432 (1984).   But among the rights a copyright owner enjoys is the right to publish, copy, and distribute the copyrighted work.   Indeed, these rights define virtually the entire scope of an owner's rights in intangible property such as a copyright.   Interference with these rights may be "different" from the physical removal of tangible objects, but it is not clear why this difference matters under the terms of § 2314. The statute makes no distinction between tangible and intangible property.   The basic goal of the National Stolen Property Act, thwarting the interstate transportation of misappropriated goods, is not served by the judicial imposition of this distinction.   Although the rights of copyright owners

---

[1] In *United States* v. *Drum*, the Court of Appeals for the Eleventh Circuit considered and rejected the arguments offered in *United States* v. *Smith* and reiterated by the Court today.   I agree with *Drum* that neither the language nor purpose of § 2314 supports the view that the statute does not reach the unauthorized duplication and distribution of copyrighted material.

in their property may be more limited than those of owners of other kinds of property, they are surely "just as deserving of protection . . . ." *United States* v. *Drum, supra,* at 1506.

The Court concedes that § 2314 has never been interpreted to require that the goods, wares, or merchandise stolen and transported in violation of the statute remain in unaltered form. *Ante,* at 216. See also *United States* v. *Bottone,* 365 F. 2d 389, 393–394 (CA2 1966). It likewise recognizes that the statute is applicable even when the misappropriated item "owes a major portion of its value to an intangible component." *Ante,* at 216. The difficulty the Court finds with the application of § 2314 here is in finding a theft, conversion, or fraudulent taking, in light of the intangible nature of a copyright. But this difficulty, it seems to me, has more to do with its views on the relative evil of copyright infringement versus other kinds of thievery, than it does with interpretation of the statutory language.

The statutory terms at issue here, *i. e.,* "stolen, converted or taken by fraud," traditionally have been given broad scope by the courts. For example, in *United States* v. *Turley,* 352 U. S. 407 (1957), this Court held that the term "stolen" included all felonious takings with intent to deprive the owner of the rights and benefits of ownership, regardless of whether the theft would constitute larceny at common law. *Id.,* at 417. Similarly, in *Morissette* v. *United States,* 342 U. S. 246 (1952), the Court stated that conversion "may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use." *Id.,* at 271–272.

Dowling's unauthorized duplication and commercial exploitation of the copyrighted performances were intended to gain for himself the rights and benefits lawfully reserved to the copyright owner. Under *Turley, supra,* his acts should be

viewed as the theft of these performances. Likewise, Dowling's acts constitute the unauthorized use of another's property and are fairly cognizable as conversion under the Court's definition in *Morissette*.

The Court invokes the familiar rule that a criminal statute is to be construed narrowly. This rule is intended to assure fair warning to the public, *e. g.*, *United States* v. *Bass*, 404 U. S. 336, 348 (1971); *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931), and is applied when statutory language is ambiguous or inadequate to put persons on notice of what the legislature has made a crime. See, *e. g.*, *United States* v. *Bass, supra; Rewis* v. *United States*, 401 U. S. 808, 812 (1971); *Bell* v. *United States*, 349 U. S. 81, 83 (1955). I disagree not with these principles, but with their application to this statute. As I read § 2314, it is not ambiguous, but simply very broad. The statute punishes individuals who transport goods, wares, or merchandise worth $5,000 or more, knowing "the same to have been stolen, converted or taken by fraud." 18 U. S. C. § 2314. As noted above, this Court has given the terms "stolen" and "converted" broad meaning in the past. The petitioner could not have had any doubt that he was committing a theft as well as defrauding the copyright owner.[2]

The Court also emphasizes the fact that the copyright laws contain their own penalties for violation of their terms. But the fact that particular conduct may violate more than one federal law does not foreclose the Government from making a choice as to which of the statutes should be the basis for an indictment. "This Court has long recognized that when an act violates more than one criminal statute, the Govern-

---

[2] Indeed, there was stipulated testimony by a former employee of petitioner's, himself an unindicted co-conspirator, that petitioner and his partner "were wary of any unusually large record orders, because they could be charged with an interstate transportation of stolen property if they shipped more than $5,000 worth of records." App. A19–A20 (stipulation regarding testimony of Aca "Ace" Anderson).

ment may prosecute under either so long as it does not discriminate against any class of defendants." *United States* v. *Batchelder*, 442 U. S. 114, 123–124 (1979).

Finally, Congress implicitly has approved the Government's use of § 2314 to reach conduct like Dowling's. In adopting the Piracy and Counterfeiting Amendments Act of 1982, Pub. L. 97–180, 96 Stat. 91, Congress provided that the new penalties "shall be in addition to any other provisions of title 17 *or any other law.*" 18 U. S. C. § 2319(a) (emphasis added). The Senate Judiciary Committee specifically added the italicized language to clarify that the new provision "supplement[s] existing remedies contained in the copyright law *or any other law.*" S. Rep. No. 97–274, p. 2 (1981) (emphasis added). Many courts had used § 2314 to reach the shipment of goods containing unauthorized use of copyrighted material prior to the enactment of the Piracy and Counterfeiting Amendments Act. By choosing to make its new felony provisions supplemental, Congress implicitly consented to continued application of § 2314 to these offenses.

Dowling and his partners "could not have doubted the criminal nature of their conduct . . . ." *United States* v. *Bottone, supra,* at 394. His claim that § 2314 does not reach his clearly unlawful use of copyrighted performances evinces "the sort of sterile formality" properly rejected by the vast majority of courts that have considered the question. *United States* v. *Belmont,* 715 F. 2d 459, 462 (CA9 1983), cert. denied, 465 U. S. 1022 (1984). Accordingly, I dissent.