**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gerald WAECHTER,
Defendant-Appellant.**

No. 83–1382.

United States Court of Appeals,
Sixth Circuit.

Argued July 18, 1985.

Decided Sept. 4, 1985.

Joseph P. Zanglin, Arthur J. Tarnow, argued, Detroit, Mich., for defendant-appellant.

Joel M. Shere, U.S. Atty., Ellen Dennis, argued, Blondell L. Morey, Detroit, Mich., for plaintiff-appellee.

Before MARTIN and JONES, Circuit Judges, and SILER, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Appellant Gerald Waechter appeals from his conviction on seventeen counts of knowingly making false statements to the Department of Housing and Urban Development (HUD), 18 U.S.C. § 1010. Waechter is a real estate investor whose alleged false statements involved bids that he caused to be placed for houses HUD was selling. The Government alleged that Waechter's practice of having employees submit multiple bids for a single property, in a manner that did not reveal that Waechter controlled all the bids, constituted false statements because Waechter intended to withdraw any bid except the lowest bid necessary to outbid his competitors and enable him to purchase a house. As we find no evidence that Waechter's method of bidding involved making either express or implied statements to HUD that were false, the district court's judgment in this case is reversed.

## I.

In 1974, HUD owned over 15,000 single-family houses in the Detroit metropolitan area as a result of foreclosures of Federal Housing Administration loans. The size of this inventory of houses in need of repair was unmatched elsewhere in the country. Although HUD generally repaired houses itself before offering them for sale to the public, the department determined to make an exception in Detroit. HUD established a special pilot program in Detroit under which private parties purchased HUD houses "as is." The purchasers were either investors who repaired the houses and then offered them for resale, or owner-occupants. The object of the Detroit pilot program was to transfer HUD's overwhelming inventory of houses to private owner-occupants as quickly as possible.

The Detroit office of HUD operated independently from Washington in establishing the rules and regulations that governed the pilot program. A group of employees in the Detroit HUD office made policy decisions concerning the pilot program. Policies were not always reduced to writing. Some policies remained informal and unannounced, while others were published in HUD's selling list books which informed the public of the houses that were available for sale and the requirements for placing bids on the houses.

The Detroit HUD office established a bidding system under which it accepted bids on each of a group of houses until a publicly-announced closing date. HUD then sorted the bids according to the individual house with which they were concerned. At a public bid-opening ceremony the name and address of each bidder and the amount of each bid was read aloud. When a "doing business as" (d/b/a) name was used, HUD announced only that name, although an individual's signature was required on each bid. HUD generally retained the three highest bids on each house and returned all other bids to the persons who submitted them. The three highest bids on each property were referred to as the top bid, the first back-up bid, and the second back-up bid. An owner-occupant whose bid was among the top three bids always received the first opportunity to purchase the house in preference to two investors with higher bids.

Under the bidding system established for the Detroit pilot program it was necessary to retain the two back-up bids because bids were only "Offers to Deal" rather than "Offers to Purchase." Although a form entitled "Offer to purchase and Broker's Tender" was used for bids, HUD's pilot program listing books defined bids as "Offers to Deal." Previously, a bid on a HUD

* The Honorable Eugene E. Siler, Jr., Chief Judge, United States District Court for the Eastern District of Kentucky, sitting by designation.

house was irrevocable, legally binding on the bidder, and had to be accompanied by a deposit check representing ten percent of the bid. Under the pilot program, HUD received between 600 and 1200 bids for some bid openings, which might involve between 100 and 200 houses. HUD did not have the clerical staff to return by certified mail all the deposit checks of losing bids. Therefore, under the pilot program, a bidder was not required to submit a deposit check along with each bid. A bidder retained the option of withdrawing, cancelling, or simply not responding to his or her winning bid for any reason.

Submission of a bid on a particular house did not represent a firm committment to purchase the property. Instead, the winning bidder had from the day of the bid-opening until the following Friday to deposit ten percent of the top bid. If the winning bidder did not meet this deadline for any reason, HUD notified the first back-up bid, who received forty-eight hours during which to deposit ten percent of that bid. If the deposit was not submitted in time, the party who had placed the second back-up bid received another forty-eight hours during which to make the deposit. If all three bidders declined or otherwise failed to deposit ten percent of their bids, HUD took the property off the market until a later date, at which time the house would in most cases be offered at a lower minimum bid.

HUD had no regulation or publicly-announced policy against the use of d/b/a's in bidding for houses offered through the Detroit pilot program. Nor did HUD have a publicly-announced policy prohibiting multiple bids on a single property by a single person. HUD employees testified that as a matter of unpublished, in-house policy, HUD considered genuine only the highest bid by an individual or members of the same family for any one property. Allegedly all other bids were considered "non-responsive" and were disregarded. On July 16, 1979, six days after the last acts by Waechter and his employees that were the basis of Waechter's indictment, HUD first published its policy against multiple

bidding by a single person on a single property.

Multiple bidding by one person, in the sense of one investor bidding for more than one house, was encouraged by HUD. The department's objective was to reduce its inventory of houses as quickly as it could. HUD did publicly establish one prohibition pertaining to this sort of multiple bidding, which it published in all HUD listing books in bold type:

## ATTENTION; INVESTOR PURCHASERS

### WARNING

**WHEN INVESTORS ARE NOTIFIED THAT THEY ARE THE SUCCESSFUL BIDDER ON MORE THAN ONE PROPERTY IN A SCHEDULED BID OPENING, THEY MUST SUBMIT COMPLETE SALES PACKAGES ON EACH AND EVERY PROPERTY. FAILURE TO DO SO WILL RESULT IN THE CANCELLATION OF ALL SALES TO THAT INVESTOR FOR THAT WEEK'S BID OPENING.**

By this policy, HUD employees testified that HUD intended to prevent an investor who had the highest bid on more than one property from purchasing the most profitable properties and declining all other properties. Thus, withdrawal of a winning bid for one property offered on a particular day operated as withdrawal of bids on all other properties offered that day.

Gerald Waechter is a Detroit real estate investor. The evidence adduced at trial reveals that Waechter and his assistant Steve Diamond designed a method of bidding for HUD houses that was tailored to enable them to take advantage of HUD's bidding practices in administering the pilot program. Waechter's method of bidding maximized his chances of winning the auction on any particular property while also paying the lowest price possible to purchase the property by outbidding any competitors. Between May 29, 1979 and July 10, 1979, Waechter placed either two or

three bids on at least seventeen HUD houses. He accomplished this as an undisclosed principal acting through five employees as agents.

When bids made on his behalf were the three highest bids, top, first and second back-up bids, Waechter caused his employees to withdraw the top and the first back-up bids. His employee then purchased the house at the second back-up bid price, Waechter's own lowest bid. If Waechter's bids were top, first back-up, and fourth highest, which would be returned, only Waechter's top bid would be withdrawn and the property would be bought for him at the first back-up bid price, his own second lowest bid. As Waechter bid on increasing numbers of houses offered at each individual bid opening, he had his employees enter bids under as many as ten d/b/a names. In this manner, no single name appeared consistently as one of the top three bids on the numerous houses on which Waechter was bidding. Waechter further obscured the origin of some bids made on his behalf by submitting the bids of each employee through one of three independent brokers rather than through a single broker. The signature of the individual Waechter employee in whose name the bid was placed always appeared on the bid form. The employees never intended to purchase property for personal use or as their own investment, and often were unaware that a bid form they had signed in blank had been filled in and submitted to HUD. Waechter's bids were not represented as the bids of owner-occupants in order to gain the preferential treatment HUD accorded these bidders. Waechter also did not pick and choose among the houses that he won on any one day; his employees bought the houses on which Waechter outbid his competitors.

A federal grand jury indicted Waechter on one count of conspiracy, 18 U.S.C. § 371, and eighteen counts of making false statements to HUD, 18 U.S.C. §§ 2, 1010. The district court denied Waechter's pre-trial motions to dismiss for failure to charge a crime. At the close of the government's evidence, the district court granted Waechter's motion for acquittal on the conspiracy count and one count of making a false statement. The jury returned a verdict of guilty on each of the remaining seventeen counts of making false statements. The district court denied Waechter's post-trial motions for acquittal or a new trial and to set aside the verdict on the basis of juror misconduct. Waechter was sentenced to concurrent terms of two years on each count and fined $20,000.

■ On appeal, Waechter maintains that although his method of bidding may have been a fraudulent scheme, its execution did not involve making any false statements to HUD. In its brief on appeal, the government acknowledges that "submission of each bid would not have constituted a crime under § 1010." The government instead asserts that the single false statement charged in each count of the indictment was the false impression created by "Waechter's concealment of his submission of multiple bids for a single property as an undisclosed principle." We resolve this conflict in favor of Waechter because we construe section 1010 to require proof that the defendant made an assertion of fact to HUD, a statement that was subject to proof or disproof, and we find no evidence that his bidding method entailed making statements that violated section 1010.

## II.

Title 18 of the United States Code contains numerous provisions which prohibit various forms of fraud. 18 U.S.C. § 1010 prohibits the making of false statements in order to gain advantage over HUD. Only the most general of the purposes prohibited by section 1010 is relevant to the present case.

Whoever, ... for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes or passes as true any instrument, paper, or document, knowing

it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

On its face this statute is concerned with traditional false representations: forgery, counterfeiting, lying about values of property or income.

In construing the term false statement as used in section 1010 we are mindful of the thoroughly-established principal that the conduct prohibited by a criminal statute is to be narrowly construed. *See Dowling v. United States,* —— U.S. ——, 105 S.Ct. 3127, 3132, 87 L.Ed.2d 152 (1985); *Williams v. United States,* 458 U.S. 279, 290, 102 S.Ct. 3088, 3094, 73 L.Ed.2d 767 (1982); *United States v. Cox,* 593 F.2d 46, 47, 49 (6th Cir.1979). We also construe section 1010 in a manner that acknowledges the distinctions between this statute and 18 U.S.C. § 1001, a distinction that the Second Circuit has recognized. *See United States v. Huber,* 603 F.2d 387, 398–99 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). Section 1001 prohibits the making of false statements to any department or agency of the federal government, and thus overlaps with section 1010. Section 1001, however, also proscribes the use of tricks, schemes, or devices to obscure or falsify a material fact, conduct on which section 1010 is silent. Although a false statement made to HUD is actionable under both section 1010 and section 1001, only the latter statute governs fraudulent schemes.

It is fundamental that a false statement is a "factual assertion," *Williams v. United States,* 458 U.S. at 284, 102 S.Ct. at 3091. When the government charges a person with violating section 1010 it must identify a statement made to HUD by the defendants which asserts a proposition that is subject to proof or disproof. The government has established one element of the defendant's guilt when its evidence demonstrates that the asserted proposition is untrue.

A documentary factual assertion may be either express or implied. An express statement will appear on the face of the document that asserts the factual proposition. First, the express factual assertion may be an affirmative statement. *See, e.g., United States v. Markey,* 693 F.2d 594 (6th Cir.1982) (bids to purchase FHA houses contained false statements that bidder's son would occupy the houses, which qualified bidder for preference as an owner-occupant); *United States v. Bernstein,* 533 F.2d 775, 783 (2d Cir.1976) (false statements of employment and false statements of self-employment made in applications for mortgage credit); *United States v. Tremont,* 429 F.2d 1166, 1168 (1st Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 63 (1970) (false statement in FHA loan application concerning intended use of loan proceeds); *United States v. Oberman,* 318 F.2d 877 (4th Cir.1963) (false statements in FHA home improvement loan applications concerning intended use of loan proceeds).

Second, the express factual assertion may arise when the omission of information expressly sought by a document is combined with a signature certifying the completeness or truthfulness of the information provided in the document. *See, e.g., United States v. Dick,* 744 F.2d 546, 554 (7th Cir.1984) (sworn statement that affidavits were complete when in fact they were incomplete); *United States v. Mattox,* 689 F.2d 531, 532 (5th Cir.1982) (false statements made by failure to answer questions on government form when defendant had a duty to supply the information sought); *United States v. Barbato,* 471 F.2d 918 (1st Cir.1973) (by his signature defendant certified that a financial statement he submitted to HUD was correct, although it failed to disclose an outstanding liability); *United States v. Leach,* 427 F.2d 1107, 1111 (1st Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 95, 27 L.Ed.2d 59 (1970) (false statement made by failure to disclose certain debts combined with signature certifying all statements were true).

An implied factual assertion does not appear on the face of a document. Instead,

use of a document makes a factual assertion of those propositions that are necessarily implied by the system of statutes, regulations, and announced policies which created the document. In *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), the Supreme Court considered whether a check that was intentionally drawn on insufficient funds made a false statement under 18 U.S.C. § 1014, which prohibits false statements to certain enumerated financial institutions. Although *Williams* was a 5–4 split decision, both the majority and the dissent used similar analyses. To determine what factual assertions a check makes, the majority looked to the Uniform Commercial Code and the parallel state statute which create and define the check as a financial instrument. The Court found that under these statutes a check does not represent a factual assertion that sufficient funds are available in the named account to pay the check; by executing a check, the drawer does impliedly state that she will personally pay the stated amount if the check is dishonored by the drawee. *Id.* at 285, 102 S.Ct. at 3091.

In concluding that a check kiting scheme is not itself actionable as a false statement under section 1014, the Court rejected the government's assertion that as a matter of general understanding the drawer of a check asserts that he has sufficient funds on deposit to pay the check. "[W]hen interpreting a criminal statute that does not explicitly reach the conduct in question, we are reluctant to base an expansive reading on inferences drawn from subjective and variable 'understandings.'" *Id.* at 286, 102 S.Ct. at 3092. Four dissenters departed from the majority in *Williams* primarily on this point. The dissenters would not only look to the statutes, but would also look to accepted practice to determine the "necessary implications" or "implicit representations" that a check carries. *Id.* at 296, 297, 102 S.Ct. at 3097, 3098 (Marshall, J., dissenting).

We are sensitive to our responsibility to narrowly construe the criminal statute at issue in the present case. We are also aware that by careful phrasing a prosecutor may characterize the conduct involved in executing a fraudulent scheme as implied false statements. Therefore, we hold that use of a document makes the factual assertions necessarily implied from the statutes, regulations, and announced policies that created the document.

### III.

■ To convict Waechter of violating section 1010 the government bore the burden of adducing evidence from which a jury could conclude beyond a reasonable doubt that at least one bid placed with HUD on behalf of Waechter expressly or impliedly asserted a factual proposition that was false. Even viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 90, 62 S.Ct. 457, 474, 86 L.Ed. 680 (1942), the guilty verdicts in the present case are not supported by substantial evidence.

First, the bids placed on behalf of Waechter contained no express affirmative false statements. Waechter's agents did not state that they were owner-occupants rather than investors; the bidder did not state that he or she was not acting as agent for an undisclosed principal; nor did any bid include the statement that this was the only bid on a particular house by an undisclosed principal; the bids did not contain statements that the bidder was not bidding on this or another property using multiple d/b/a names; no bid expressly stated that the bidder intended to purchase the subject house rather than withdraw if this was the top bid. Second, the bids did not make express false statements by omission. HUD's bid forms did not seek any of the information outlined above with the exception of a statement concerning status as an owner-occupant or an investor, which Waechter's bids supplied truthfully.

Third, to determine whether Waechter's bids made implied statements that were false we evaluate the necessary implications of the system of bidding that HUD established by its announced policies.

HUD's policies under the Detroit pilot program did not prohibit a person from using agents to place bids on one's behalf as an undisclosed principal. HUD policies neither prohibited nor required disclosure of the fact that a person was using multiple d/b/a names to bid on houses offered through the pilot program. Nor did HUD policies prohibit a person from withdrawing a bid for any reason or no reason.

Bids placed under the pilot program did necessarily imply two factual assertions. First, by published policy HUD prohibited a single person from placing more than one bid on each house offered for sale by HUD. This policy was first published in HUD's listing book dated July 16, 1979. Thereafter, each bid placed with HUD impliedly stated that it was the only bid placed by the bidder on the relevant house. All of the bids on Waechter's behalf that form the basis for his conviction were placed with HUD before this policy was published and do not express this implied statement. Second, at all times relevant to this case and by publicly-announced policy, HUD required an investor who won more than one house offered at a single bid-opening to purchase all of those houses or to purchase none of them. Thus, each bid by an investor necessarily implied an intent either to buy all of the houses that investor won during a single bid-opening or to forego purchasing any of those houses. This implied assertion in bids by Waechter was a true statement. He intended to purchase every house on which he placed a winning bid, but intended to do so at the lowest possible price.

The evidence in this case does not support a finding that any bid on behalf of Waechter asserted an express or implicit false statement to HUD.

### IV.

■ The government's evidence that Waechter placed bids in bad faith for HUD houses and that his method of bidding created a false impression will not support his conviction under section 1010. Nonetheless, Waechter's method of bidding may not have been legal and his conduct certainly does not merit ethical approval. By bidding as an undisclosed principal through several employees who placed multiple bids on certain houses, Waechter may have executed a fraudulent scheme to distort HUD's sealed bidding system. This fraudulent scheme may have been actionable under section 1001. It appears, however, that the government charged Waechter under section 1010 in order to take advantage of certain facts peculiar to this particular case. We cannot allow the government to convict Waechter of being a bad person, engaging in sharp practices, or of discovering a loophole in HUD's policies. The government must prove that Waechter was guilty of the crime charged.

For the foregoing reasons, the district court's judgment is REVERSED.