**LIVING MUSIC RECORDS, INC. and Living Music, Inc., Plaintiffs,**

v.

**The MOSS MUSIC GROUP, INC., Pickwick Music Group, Inc., Pickwick Entertainment, Inc., Pickwick Holdings, Inc., Fleet Factors Corp., Ambassador Factors, Ira Moss, Jan Weinberg, Seymour Leslie, and Joseph Cohen, Defendants.**

No. 90 Civ. 4250 (LBS).

United States District Court,
S.D. New York.

July 20, 1993.

Lehhman & Gikow, P.C., New York City (David H. Gikow, of counsel), for plaintiffs.

Peirez, Ackerman & Levine, Great Neck, NY (David J. Abeshouse, of counsel), for defendants Seymour Leslie and Joseph Cohen.

Ruskin, Moscou, Evans & Faltischek, P.C., Mineola, NY (Douglass J. Good, of counsel), for defendants Fleet Factors Corp., Ambassador Factors.

Paul Bollo, Greenwich, CT, for defendants Jan Weinberg, Pickwick Music Group, Inc., Pickwick Entertainment, Inc., and Pickwick Holdings Inc.

Ira Moss, pro se.

## OPINION

SAND, District Judge.

This action is brought by plaintiffs Living Music Records ("LMR") and Living Music, Inc. ("LMI") against various corporate and individual defendants, alleging violations of the Copyright Act and RICO, and also asserting a number of statutory and common law claims under New York law. Because we find that we have no subject matter jurisdiction over the supposed copyright claim, and because we find that plaintiffs have not substantiated essential elements of their RICO claim, we dismiss the federal claims. Having found no federal cause of action, we decline to take jurisdiction over the remaining state law causes of action.

### The Parties

Plaintiff LMR is a record company which is wholly-owned by plaintiff LMI; both are corporations organized under the laws of the State of Connecticut and with their principal places of business in Connecticut. Plaintiffs are the exclusive owners of certain copyrights which are registered in the United States Copyright Office. Among plaintiffs' principal artists/composers are various "new age" groups, including Grammy Award nominee saxophonist and composer Paul Winter and the Paul Winter Consort.

The defendants fall into two groups, corporate and individual. Defendant Moss Music Group, Inc. ("MMG") is a New York corporation which, as will be discussed in detail below, entered into an agreement with plaintiffs to manufacture and distribute phonorecords which embody the copyrighted material owned by plaintiffs. Defendant Fleet Factors Corp., Ambassador Factors ("Ambassador") is a Rhode Island corporation with its principal place of business in New York, which acted as a factor to MMG, that is, lent money to MMG. Defendants Pickwick Music Group, Inc. ("PMG") and defendant Pickwick Entertainment, Inc. ("PEI") are Delaware corporations which have their principal places of business in Connecticut. PMG is a wholly-owned subsidiary of PEI. Ambassador also acted as a factor to PMG.

Defendant Ira Moss resides in New York and was the founder, President and sole stockholder of MMG. Moss was later employed by PMG. Defendants Seymour Leslie and Joseph Cohen were directors, and Cohen was and is President, of Pickwick Communications, Inc. ("PCI"), a music record business not a party to this action. In or about mid–1988, PCI entered into negotiations with defendant Jan Weinberg to license to Weinberg, through a corporate entity to be formed by him, PCI's rights under certain of its master recordings. In June of 1988, Weinberg formed PEI, and Cohen and Leslie acted as directors.

### Procedural Background

Initially, defendants Ambassador and defendants Leslie and Cohen had moved this Court for judgment of dismissal on the pleadings pursuant to Fed.R.Civ.P. 12(c). Moss joined in Leslie and Cohen's motion; Weinberg, PMG and PEI also moved for judgment of dismissal on the pleadings, adopting the arguments made by the other movants.

At oral argument of those motions, this Court converted the motions to Rule 56 motions for summary judgment, and directed that the converted motions deal only with plaintiffs' allegedly federal causes of action. The parties were given further opportunity

to file briefs, and additional, voluminous briefs were in fact filed. The motions were thereupon taken on submission.

*Facts*

Although the inferences to be drawn from the factual circumstances surrounding this litigation are hotly contested, the facts themselves are largely undisputed. We briefly summarize the facts we consider relevant to these motions.

Ambassador, a commercial finance company, began extending credit, loans and advances to MMG on or about January 24, 1986. In connection with this financing, Ambassador held a perfected security interest in all of MMG's assets including its then-existing and after-acquired accounts receivable, equipment, inventory, contract rights, copyrights, trademarks and other general intangibles (the "Collateral"). Ambassador filed all the necessary documentation to properly record its security interests.

On or about September 10, 1987 plaintiff LMI entered into an exclusive licensing agreement with MMG pursuant to which MMG was authorized to make and sell copies consisting of phonograph records, tapes and compact discs (the "phonorecords") of certain musical master recordings in which plaintiff held copyrights. The Agreement provided, *inter alia*, that the terms of the Agreement would be binding on the parties' successors and assigns, and that any sale of the assets or assignment of rights would not affect or dilute the rights of the other party. (Agreement, ¶ 18(d).)

Although plaintiffs argue that Ambassador knew that MMG had entered into this Licensing Agreement, both Ira Moss and Ambassador's Executive Vice President, Philip Cotumaccio, testified that Ambassador had no knowledge of the Licensing Agreement prior to the present litigation. (Affidavit of Douglas Good, "Good Aff.", Exh. E.)

Soon after the Licensing Agreement was entered into, MMG began to suffer serious financial difficulties. Sometime in mid–1988, defendant Moss approached defendant Leslie, whom he had known for some twenty years, to discuss MMG's financial condition

and possibilities for alternative sources of financing or an individual or entity willing to take an equity position in MMG. (Moss Dep., pp. 15–17; Leslie Dep., pp. 9–11.)

By June or July, 1988 MMG was in default of its financial obligations, including certain of its royalty obligations to plaintiffs under the Licensing Agreement, although MMG had paid almost half of the royalties due up to that point. (Good Aff.Exh. G.) MMG had also failed to fulfill its marketing responsibilities under the Licensing Agreement.

On or about July 8, 1988 and August 2, 1988, plaintiffs purported to give notice to MMG that they were terminating the Licensing Agreement due to MMG's failure to pay royalties and to carry out effectively its marketing responsibilities. Paragraph One of the Licensing Agreement provides that the Agreement may not be terminated for those reasons until December 31, 1988, at the earliest. Most of the factual and legal dispute revolves around the effectiveness of the termination and which defendants knew about the purported termination at what time.

On August 17, 1988, MMG surrendered to Ambassador the Collateral in which Ambassador held a first position security interest. Upon receipt of the Collateral, Ambassador re-sold it by private sale, on notice to MMG, to defendant PMG for an amount equal to the then-outstanding indebtedness of MMG to Ambassador which was calculated at approximately $1.9 Million. Ambassador financed PMG's purchase of those assets and was granted a first position security interest in the assets. At the time of the transaction, MMG had approximately 86,000 phonorecords containing recordings of plaintiffs' copyrighted material, which comprised less than 10% of the phonorecords in MMG's inventory.

The evidence is clear that no copies of plaintiff's record masters were made by any defendant at any time after August 17, 1988; the only copies ever manufactured were made by MMG pursuant to the terms of the Licensing Agreement. (Good Aff., Exh. M.) In fact, Moss testified, and plaintiff's do not dispute, that by early summer MMG had ceased manufacturing phonorecords due to lack of funds (Moss Dep. at p. 74). Plaintiffs

did not manufacture or own or pay for any of the phonorecords in MMG's inventory on August 17, 1988. Furthermore, plaintiffs' representative, Steven Shmerler, testified at his deposition that the original master recordings were not delivered by MMG to Ambassador or to Pickwick because all of them were at production houses (Shmerler Dep., Vol. II, pp. 46–47.)

After the resale of the Collateral, PMG and plaintiffs had negotiations regarding a new licensing agreement. In their briefs, plaintiffs portray those negotiations as essentially coercive attempts by the Pickwick defendants to procure new licensing agreements. However, Winter described the purpose of the meetings more benignly: "to attempt to persuade Living Music to do a distribution deal with Pickwick." (Good Aff. Exh.L.) One meeting was held in Connecticut in September, 1988. This meeting was followed up by a written offer from PMG to LMI in October, 1988. The second meeting was held in New York in November, 1988. Ambassador did not participate in these negotiations.

Plaintiffs claim that as part of these negotiations, defendants threatened to "dump" the phonorecords on the market and keep all the proceeds if plaintiffs would not enter into new licensing agreements. The deposition and documentary evidence however reveals that the word "dump" was never used, and that any "threat" that may have been made was implied and not outright and followed from the Pickwick defendants' belief that they had rightful possession of the phonorecords and could do with them as they saw fit.

PMG operated the business until October, 1989, when it sold the assets of the business and satisfied its remaining indebtedness to Ambassador. Plaintiffs allege that the defendants engaged in similar transactions and "schemes" aimed at other new age artists who had entered into licensing agreements with MMG, but plaintiffs present no evidence of any other such schemes.

### Discussion

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Summary judgment is likewise appropriate where the movant demonstrates that the plaintiffs have failed to present any credible evidence to support a necessary element of their claim. *Rosenthal v. Kingsley*, 674 F.Supp. 1113, 1115 (S.D.N.Y.1987). A court does not resolve disputed issues of fact, but rather, resolving any ambiguities and drawing all reasonable inferences against the moving party, assesses whether genuine issues of material fact remain for the trier of fact.

We find that plaintiffs have failed to present credible evidence which would support our exercise of jurisdiction on the copyright claim. We further find that plaintiffs have failed to provide credible evidence of either predicate acts or a pattern of racketeering activity to substantiate essential elements of their RICO claim. We discuss each in turn.

### Copyright Claim

Plaintiff's first cause of action asserts a claim under the Copyright Act. Federal courts have exclusive jurisdiction over all claims arising under federal copyright laws by virtue of 28 U.S.C. § 1338. However, "it is beyond dispute that not every case involving federal copyright laws 'arises under' those laws such that federal jurisdiction is proper pursuant to § 1338(a)." *Berger v. Simon & Schuster*, 631 F.Supp. 915, 917 (S.D.N.Y.1986). In other words, the mere allegation of infringement is not dispositive of the jurisdictional question.

The Second Circuit has recently mandated a three part test for determining whether federal jurisdiction is appropriate in any particular case. In *Schoenberg v. Shapolsky Publishers, Inc.*, 971 F.2d 926 (2d Cir.1992), the plaintiff had entered into a licensing agreement with defendant's predecessor to publish plaintiff's manuscript. As in the case before this Court, Schoenberg alleged that

the agreement had been terminated because defendant failed to publish and promote the work in a timely manner, and then had failed to pay royalties. Schoenberg alleged that after the contract had thus been terminated, "subsequent publication of the work resulted in an infringement of his copyright, thereby giving rise to an action under the Federal Copyright Act." *Id.* at 928.

The *Schoenberg* court examined the case law precedent on the question of when a complaint actually sets forth a claim under the copyright act as distinguished from a complaint which is fundamentally an action for breach of contract. The court then mandated a three part test, relying on three cases: *T.B. Harms Co. v. Eliscu*, 339 F.2d 823, 828 (2d Cir.1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965); *Berger, supra;* and *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1045 (D.C.Cir.1981).

■ First, the district court must determine whether the plaintiff's infringement claim is merely "incidental" to the plaintiff's claim seeking determination of ownership or contractual rights under the copyright. This first part of the test looks to the essential nature of the claim, as in *Berger*, to ascertain what role the infringement allegation plays in the lawsuit. If the resolution of the infringement claim is only a necessary consequence of determining the contractual rights of the parties, then it is incidental and will not support federal jurisdiction. In this regard, the *Schoenberg* court instructed that it is relevant, though not necessarily dispositive, if the complaint asserts a separate claim for breach of contract. If it does, it is an indication that the action may more properly be considered one for breach of contract and not one arising under the copyright laws. *See also Kamakazi Music Corp. v. Robbins Music Corporation*, 684 F.2d 228, 230 (2d Cir. 1982) ("Kamakazi's complaint . . . clearly stated claims under the Copyright Act. It did not mention breach of contract as a theory of liability.")

■ If the complaint survives this first hurdle, that is, if the infringement claim is not merely incidental to the contract claim, the district court must proceed to determine if the complaint alleges a breach of a condi-

tion to, or a covenant of, the contract licensing the copyright. If the complaint alleges a breach of a condition of the licensing agreement, which would mean that the license never took effect and any publication or production of the copyrighted work would be an infringement, then the action arises under the copyright law. If the complaint alleges merely a breach of a covenant to a contract, the court must determine whether the breach is so material as to create a right of rescission. If so, then the complaint arises under the copyright law. *Id.* at 932–33.

In *Schoenberg*, the Second Circuit remanded to the district court for factual development. Here, the parties have conducted extensive discovery and the facts have been fully presented. Applying the *Schoenberg* test to the facts of the case before us leads to the conclusion that even if, giving plaintiffs the benefit of the doubt, it could be said that the infringement claim were not incidental, still the complaint states nothing more than a breach of covenant which would not give rise to a right of rescission.

■ On the first prong of the test, it is relevant that the plaintiffs' copyright claim and contract claim, the fourth cause of action, are virtually identical. The gravamen of the alleged copyright claim is the question of royalties and a determination of whether Fleet and then PMG validly assumed rights under the licensing agreement or whether the license had effectively been terminated. There is no question of illegal copying; the parties are all in agreement that no phonorecords were produced except those validly manufactured pursuant to the licensing agreement. Ambassador's liability, if any, requires a determination under the U.C.C. and state law of the validity of its possession of the assets in which it held a security interest.

Furthermore, the question of the propriety of the eventual sale by PMG of the phonorecords turns on the question of the respective parties' rights under the agreement; it in no way requires the Court to construe any aspect of the Copyright Act. Thus it appears that the infringement claim is incidental to

the contract claim. Our reasoning in the *Berger* case applies *a fortiori* here:

> Although plaintiff's complaint is framed entirely in terms of infringement, we find that it is really an action on a contract, wherein plaintiff in substance, albeit not in form, is seeking a declaration that certain conditions precedent to a revocation of a license have taken place. There is nothing in this case which requires construction of the Copyright Act. Nor is there any need to have federal principles control. Moreover, the dispute is not of such a nature as to have federal copyright implications. Thus it does not involve the scope of a copyright license or the definition of statutory terms [citation omitted]. Rather, it turns on purely factual and common law contract issues. We observe in this regard that once the contractual rights and duties of the parties are resolved, the Court so doing will not be called upon to make any determination about whether defendant's publication is an infringement. In this case, infringement *vel non* would necessarily follow from the Court's finding on the contract issues.

631 F.Supp. at 917.

■ However, even if we proceed to the other prongs of the test, we still find that it would be improper to assert federal jurisdiction. The failure to market and the failure to pay royalties are clearly breaches of covenants to, and not conditions of, the licensing agreement, and the plaintiffs do not seriously contend otherwise. Moreover, the alleged breach of the covenants is insufficient to give rise to a right of rescission. As noted above, MMG paid almost half of the royalties which plaintiffs allege are due to them, and therefore the breach cannot be the basis of rescission of the contract. Rescission of a contract is an extraordinary equitable remedy, and although the complete failure to pay royalties will support rescission, the partial payment of royalties will defeat rescission. *Nolan v. Sam Fox Publishing Company, Inc.*, 499 F.2d 1394, 1399 (2d Cir.1974) (payment of 26% of royalties held to be sufficient to preclude rescission.) Since plaintiffs would not have the right to rescind the licensing agree-

ment, the alleged breach of covenants does not support federal copyright jurisdiction.

Because we find that the pleadings and submissions do not provide a basis for exercising jurisdiction, we do not need to reach the factual or legal questions regarding the effectiveness of the alleged termination of the licensing agreement, plaintiffs' entitlement to royalties from Ambassador, PMG or any of the individual defendants, or the validity of Ambassador's taking possession of the phonorecords and the subsequent resale to PMG. These are state law questions which can adequately and appropriately be determined in a state court action.

### RICO Claims

Plaintiffs' second and third causes of action are brought for alleged violations of RICO, 18 U.S.C. § 1962(c) and § 1962(d). We find that plaintiffs have failed to provide sufficient evidence to establish the essential elements necessary for a RICO claim against any of the defendants, and the defendants' motions for summary judgment must therefore be granted.

■ To state a claim under RICO, a complaint must allege: (1) that the defendant, (2) through the commission of two or more acts, (3) constituting a "pattern", (4) of "racketeering activity", (5) directly or indirectly invests in, or maintains an interest in, or participates in, (6) an "enterprise", (7) the activities of which affect interstate commerce. *See Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Because plaintiffs bear the burden of proof on all of these elements, if they cannot present sufficient evidence on any one element, summary judgment in favor of the defendants is appropriate. We address each element in turn.

#### A. Predicate Acts

Plaintiffs allege that defendants have committed predicate acts of mail fraud, wire fraud and interstate transportation of property stolen, converted or taken by fraud. We find that plaintiffs have failed to present evidence sufficient to substantiate the allegations of predicate acts.

■ Predicate acts of mail and wire fraud must be alleged with the particularity required by Fed.R.Civ.P. 9(b). *Morin v. Trupin*, 778 F.Supp. 711, 716 (S.D.N.Y.1991). In this regard, the plaintiffs are required to allege and provide specific factual evidence of the content, time, place, and speaker of each alleged mailing or wire transmission, *Philan Ins. Ltd. v. Frank B. Hall & Co., Inc.*, 712 F.Supp. 339, 342 (S.D.N.Y.1989). Plaintiffs must also demonstrate how each purported mailing or wire transmission furthered the alleged fraudulent scheme. *McLaughlin v. Arthur Anderson*, 962 F.2d 187, 190–191 (2d Cir.1992).

■ Plaintiffs have failed to substantiate two acts of mail or wire fraud. Regarding mail fraud, at ¶ 142 of plaintiffs' factual contentions they refer, without any explication, to trial exhibits 22, 34, 37, 38, 41, 42, 43, 52, 53, 54, 55, 62, 63, 69 and 70. In their brief, plaintiffs list more exhibits (most of which are in the previous list) which supposedly support the mail fraud allegations, adding 23, 24, and 30. We do not find that any of these mailings support an allegation of mail fraud.

For example, Exhibit 22 is a letter from PEI to Shmerler, business manager of plaintiff LMI, dated November 30, 1988. The letter discusses the continuing negotiations for a new licensing agreement, but plaintiffs have pointed to no evidence of fraud, coercion, or blackmail. Exhibit 23 appears to be a list of LMI inventory; plaintiffs do not allege that it was mailed, or who prepared it, or how it is any way fraudulent or part of a fraudulent scheme. Exhibit 34 is the written offer from PMG to LMI which was discussed above. Once again, plaintiffs provide no hint of how that proposal was fraudulent or furthered a fraudulent scheme. Exhibit 52 contains copies of a letter from PEI to various creditors of MMG, which is obviously an attorney's letter explaining PEI's position concerning MMG's creditors' claims. Again, there is no indication from plaintiffs of how that letter furthered the fraudulent scheme. Exhibits 69 and 70 are printouts of Ambassador's "Statement of Account" sheets for MMG and for a corporation called Pickwick Holdings, Inc. Once more, there is no indication that these documents were mailed, or

that they were in any way inaccurate or misleading or that they played a part in a fraudulent scheme. They merely evidence that Ambassador had a factoring relationship with MMG and with certain Pickwick entities, facts which are undisputed. The other documents suffer from the same deficiencies. Contrary to plaintiffs' implicit suggestion, we do not find these documents to be self-evident instances of mail fraud. Nor do plaintiffs' allegations approach the minimum standards of Rule 9(b).

Plaintiffs' allegations of wire fraud are similarly inadequate. In ¶ 144 of plaintiffs' factual contentions, plaintiffs specifically identify only one telephone call—the rest of the allegations are so generalized that they need not even be considered by the Court. The one call alleged is between Steven Shmerler of LMI and Gordon Bossin of PEI on August 4, 1988. However, Shmerler's deposition testimony does not refer specifically to a telephone conversation, nor is there any identification of any fraudulent misrepresentations. Exhibit 30 is a letter dated August 4, 1988 from Shmerler to Bossin which makes reference to "our conversation today," but which does not indicate that it was a conversation by telephone. Furthermore, there is no allegation and no evidence that the call, if one occurred, was interstate. We decline to infer that it was interstate, since both LMI and PEI have their principal places of business in Connecticut.

The only other telephone call of which plaintiffs provide any concrete evidence is one by defendant Weinberg to the other defendants in connection with the August 17, 1988 closing; plaintiffs contend that "without [this call] the fraudulent transaction may never have occurred." Plaintiff's Suppl. Memo in Opposition, p. 19. The deposition testimony indicates that there was a call during the closing between Weinberg in Florida and the other defendants in New York. However, the testimony does not indicate that the communication contained any fraudulent misstatements or how the call furthered the alleged fraud. Rather, defendant Moss testified that during the call, defendant Weinberg insisted on the inclusion of various terms in the deal before it could close. De-

fendant Weinberg testified that the purpose of the call was merely to inform him that the deal had closed. In any event, even if we were to conclude that the plaintiffs had substantiated this instance of wire fraud, plaintiffs would still only have demonstrated *one* predicate act.

In their opening briefs, plaintiffs argued that defendants had also committed predicate acts consisting of interstate transportation and/or receipt of stolen property under 18 U.S.C. §§ 2314 and 2315. Plaintiffs do not press this claim in their summary judgment submissions, so we address the merits only briefly.

Plaintiffs' argument regarding these predicate acts appears to be that because plaintiffs terminated the licensing agreement with MMG, the subsequent transportation of "plaintiffs' phonorecords" to Ambassador and then to PMG constitutes transportation and/or receipt of stolen property under §§ 2314 and 2315. There are several factual difficulties with this argument, *i.e.*, first, it is far from clear (although we need not decide) that the licensing agreement was effectively terminated, and second, it is conceded that all the phonorecords produced were authorized under the agreement and therefore the nomenclature "plaintiffs' phonorecords" is misleading.

However, we need not linger on these difficulties, because under governing law, conversion of property rights flowing from copyrights is not reached by the statute at issue. In *Dowling v. United States*, 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1984), the Supreme Court was faced with the question of whether 18 U.S.C. § 2314 reached the interstate transportation of bootleg recordings. These bootlegs were record albums manufactured by Dowling which embodied copyrighted material owned by others which Dowling had no authorization to distribute. The government argued that this unauthorized use of the musical compositions rendered the records "stolen, converted or taken by fraud" within the meaning of the statute. *Id.* at 215, 105 S.Ct. at 3132.

The Supreme Court rejected that broad reading of the statute, explaining that in order to come under the statute, the physical property itself must have been stolen, converted or taken by fraud. Because Dowling had rightful ownership of the physical property, the record albums, he could not be held liable for conversion of property as a result of his infringement of a copyright. The Court explained at 217–218, 105 S.Ct. at 3133:

> There is no dispute in this case that Dowling's unauthorized inclusion on his bootleg albums of performances of copyrighted compositions clearly constituted infringement of those copyrights. It is less clear, however, that the taking that occurs when an infringer arrogates the use of another's protected work comfortably fits the terms associated with physical removal employed by § 2314 ... While one may colloquially link infringement with some general notion of wrongful appropriation, infringement plainly implicates a more complex set of property interests than does run-of-the-mill theft, conversion or fraud. As a result, it fits but awkwardly with the language Congress chose—"stolen, converted or taken by fraud"—to describe the sorts of goods whose interstate shipment § 2314 makes criminal.

The case before us is clearly covered by the *Dowling* decision. The physical property, the phonorecords, was produced by MMG, and was therefore never property belonging to plaintiffs. Therefore, while it is possible that if the licensing agreement was effectively terminated certain of the defendants may have infringed plaintiffs' copyrights, that infringement does not constitute conversion under the statute.

Although we find that plaintiffs have thus failed to prove an essential element of their RICO claims, we address the other elements briefly.

### B. *"Pattern" of Racketeering Activity:*

Beyond proof of at least two predicate acts, RICO requires that the acts constitute a pattern of racketeering activity. The Supreme Court has instructed that "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff ... must show that the racke-

teering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1988).

Having found that plaintiffs have not proven two predicate acts, it is somewhat superfluous to address the question of relatedness. However, we feel it is useful to remark on the question of whether plaintiffs have presented sufficient evidence on the question of continuity. We find that they have not.

The requirement of "continuity" is often met when the evidence indicates the participation of organized crime in the alleged RICO enterprise, as was intended by Congress in enacting RICO. *See, e.g., U.S. v. Local 1804-1, Int'l Longshoremen's Ass'n*, 812 F.Supp. 1303, 1316 (S.D.N.Y.1993). However, where there is no such involvement, as here, it can be more difficult to demonstrate continuity. In this case, even if we were to find that plaintiffs' had proven the predicate acts, we would find that plaintiffs had not provided sufficient evidence that there was any threat of the activities continuing into the future.

The alleged scheme involved a very limited and focused "closed-ended" transaction, the transfer of the phonorecords and the purported transfer of the licensing rights from MMG to Ambassador to PMG. From start to finish, the alleged racketeering acts spanned from June of 1988 to November of 1988, a period of about five months. The whole nature of the alleged fraudulent scheme militates against a finding of any threat of continuity. There is no evidence of any similar schemes directed at other copyright holders. Nor is there any indication that the predicates evidence an ongoing entity's regular way of conducting business, *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. Plaintiffs have therefore failed to demonstrate a pattern of racketeering activity as envisioned by RICO.

C. *"Enterprise"*:

■ In addition to proving two predicate acts that are part of a pattern of racketeering activity, to state a claim under RICO a plaintiff must also prove that the defendants have invested in, maintained an interest in, or participated in an "enterprise." The Supreme Court has explained that a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). Alternatively, "proof of various racketeering acts may be relied on to establish the existence of the charged enterprise." *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992). This second formulation encompasses the type of enterprise which is not itself a legal entity, such as a corporation, but is instead what is commonly referred to as "an association-in-fact." Such an enterprise is proven by evidence of the common association of a group of individual parties to carry out a pattern of predicate acts.

■ Although the definition of an enterprise has been construed broadly by the Second Circuit, defendants have nevertheless demonstrated that plaintiffs cannot prove that one exists here. There has been no evidence of an ongoing organization, either formal or informal. Even if one could view the various defendants as somehow comprising a functioning unit, it would be neither "ongoing" nor "continuing," but instead would be a loose association brought together to transact one, isolated business deal.

The alternative method of proof does not salvage plaintiffs' case either, as we have found that they are unable to substantiate "various racketeering acts" and therefore cannot use the proof of a pattern of racketeering to support an inference of the existence of an enterprise. In other words, had plaintiffs proven that this group of corporations and individuals had committed the predicate acts alleged as part of a continuing pattern of racketeering activity, the group would constitute an enterprise; however, having failed to prove that set of facts, plaintiffs also fall short of proving an enterprise within the meaning of the statute.

### D. *RICO Conspiracy:*

 Plaintiffs also allege a 1962(d) RICO conspiracy claim against all defendants. The core of a RICO conspiracy claim is an agreement to commit predicate acts; it follows that in order to prove the conspiracy claim, plaintiffs must demonstrate that each alleged conspirator specifically agreed to the commission of at least two predicate acts. *See, Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990); *Morin v. Trupin,* 747 F.Supp. 1051, 1067 (S.D.N.Y. 1990).

Plaintiffs have not presented sufficient evidence to substantiate this claim. There has been no concrete evidence in support of plaintiffs' allegation that the defendants entered into an agreement to commit predicate acts of mail fraud or wire fraud in order to deprive plaintiffs of their rights under the licensing agreement. What has been proven is that the defendants agreed to enter into a business transaction whereby certain assets and contract rights were purportedly transferred from defendant MMG to defendant Ambassador to defendant PMG. The evidence is undisputed that Ambassador did not know at the time of the transfer that the Collateral included plaintiffs' product. Plaintiffs' representatives, Shmerler and Winter, both testified in depositions that they did not have any personal knowledge of any discussions or agreements among the defendants to commit a fraud on the plaintiffs. Shmerler Dep., May 27, 1993, pp. 33–35; Winter Dep., pp. 226–228.

In conclusion, even after full discovery, plaintiffs have been unable to state with any specificity what predicate acts the defendants agreed to commit, or in what way the defendants manifested their agreement to commit predicate acts. Defendants are therefore entitled to summary judgment on this claim, as they have demonstrated that plaintiffs would be unable at trial to substantiate the allegations of conspiracy.

### State Claims

Although a federal court has discretion to entertain claims arising under state law pursuant to the doctrine of pendent jurisdiction, it is often the better course, as a matter of comity, to dismiss state claims where the court has found that there is no federal cause of action. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Such is the case here.

First, no diversity exists. Having found that we lack jurisdiction over the alleged copyright claim because it is essentially a contract claim, and having found that plaintiffs cannot prove a RICO cause of action, it would be imprudent for the Court to retain jurisdiction over the purely state law claims. State law questions clearly predominate, and no exceptional circumstances exist which would warrant the Court's extension of pendent jurisdiction. Therefore, claims four through eleven, and thirteen and fourteen are dismissed. Plaintiffs had previously withdrawn claim twelve.

### Conclusion

For the reasons stated above, defendants' motions for summary judgment are granted, and the action is dismissed in its entirety.

SO ORDERED.