NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4167
_____

COLLEGESOURCE, INC.,
A California Corporation,

Appellant

v.

ACADEMYONE, INC., A Pennsylvania Corporation;
DAVID K. MOLDOFF, An Individual

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-10-cv-03542)
District Judge: Honorable Mary A. McLaughlin

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
December 8, 2014

Before: VANASKIE, COWEN, and VAN ANTWERPEN, Circuit Judges

(Filed: February 5, 2015)
_____

OPINION[*]
_____

VANASKIE, Circuit Judge

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Appellant CollegeSource (CS), a California corporation, and Appellee AcademyOne (A1), a Pennsylvania corporation, are competitors in the market for college credit-transfer information. CS alleges that A1 misappropriated the contents of CS's database in an effort to stock its own fledgling database. The District Court granted summary judgment on all claims in favor of A1. CS now challenges several of the District Court's rulings, including (1) the denial of its motion to transfer this case to California; (2) the exclusion of certain evidence; (3) the dismissal of its claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), without leave to amend; and (4) the grant of summary judgment in favor of A1. We will affirm.

I.

CS touts itself as "the pioneer of the digital college course catalog and college transfer credit industry." Appellant's Br. at 11. CS's main product is the "CollegeSource Online" database, which allows paying subscribers and trial users to search and inspect over 50,000 digital course catalogs and related documents culled by CS from the offerings of colleges across the country. CS has long undertaken efforts to prevent, or enable the detection of, duplication or use of its materials by potential competitors. For instance, throughout the period at issue here, CS embedded in its catalog files an unavoidable "splash page" alerting the user that the catalog originated from CS, (*see, e.g.*, App. 2607), and a full-page "Copyright and Disclaimer," which states that "CollegeSource digital catalogs are derivative works owned and copyrighted by CollegeSource, Inc. . . . . Catalog content is owned and copyrighted by the appropriate

2

school," (*see, e.g.*, App. 2608). The notice also declares that distribution and non-commercial use are prohibited. (*Id.*)

Users of CollegeSource Online must check a box that states, "By signing in above, I agree to be bound by the terms of the . . . Subscription Agreement." (*See, e.g.*, App. 2535.) The hyperlinked Subscription Agreement states: "This Subscriber Agreement and Terms of Use govern your use of CollegeSource Online, TES, and, unless other terms and conditions expressly govern, any other electronic services from CollegeSource, Inc. that may be made available from time to time . . . ." (App. 2773.) The agreement also states that commercial use of the data is prohibited. (*Id.*)

Along with CollegeSource Online, CS offers a service known as "CataLink," which allows colleges to store their catalog information on CS's servers and link to that information from their websites, rather than hosting the information themselves. Since CataLink's inception, 110 schools have paid to use that service. (App. 2602–06.) Course catalogs accessed via CataLink, like those accessed via CollegeSource Online, contain the aforementioned Copyright and Disclaimer.

A1 was founded by Appellee David Moldoff in 2005 as a free online alternative to CS. In 2006, Moldoff approached CS to inquire whether A1 could purchase or license the contents of CS's database, but he was rebuffed. A1 then hired Beijing Zhongtian-Noah Sports Science Co., Ltd. (Noah), an independent Chinese subcontractor, to obtain course catalogs by downloading them directly from individual schools' websites. A1 also pursued an in-house effort to obtain course catalogs in the same way. By the time its

3

database launched in early 2007, A1 had amassed course catalogs from roughly 4,000 schools, most of which originated from Noah's collection efforts.

A week after the debut of A1's database, CS sent a cease-and-desist letter to A1 alleging over 700 instances of copyright infringement and directing A1 to remove the infringing materials from its website. (App. 1370–74.) After a brief review, A1 discovered that CS's allegations were largely correct. In an email to CS's president, Moldoff explained that A1 had "removed ALL course catalog PDF files as of this afternoon and are working to determine actually how many catalogs are in question have [sic] your copyright statement." (App. 3004.) Moldoff also wrote that A1 would "honor [CS's] request and remove the content." (*Id.*) A1 immediately disabled public access to the database and made efforts to remove materials that had originated with CS. This task proved technically challenging, and the record reflects that as late as 2010, A1 discovered additional documents on its servers that contained CS's Copyright and Disclaimer.

In late 2008, A1 was the winning bidder for a contract with the State of South Carolina that had also been sought by CS. Shortly thereafter, CS filed a complaint against A1 in the United States District Court for the Southern District of California in which it alleged seven federal causes of action: (1) violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(g); (2) breach of contract; (3) unjust enrichment; (4) trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (5) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (6) false advertising under the Lanham Act, 15 U.S.C. § 1125(a); and (7) a declaration of trademark invalidity under 15

4

U.S.C. § 1064. The complaint also alleged three causes of action under California law, including (1) a violation of the California Computer Crimes Act, Cal. Penal Code § 502; (2) misappropriation; and (3) unfair competition under Cal. Bus. & Prof. Code § 17200. Soon thereafter, A1 sent out several hundred letters to colleges stating that CS had filed "copyright claims . . . whereby [CS] is claiming ownership and control of your institution's digital catalog and the course descriptions contained within . . . ." (App. 565.)

A1 moved to dismiss the California action for lack of personal jurisdiction. The District Court permitted limited discovery on that issue. Moldoff filed affidavits stating that A1 transacted no business in California and had no knowledge that CS was based in California. The District Court ultimately dismissed for lack of personal jurisdiction and CS appealed. In July 2010, while the appeal was pending, CS sued A1 in federal district court in Pennsylvania, where jurisdiction was indisputably proper. That complaint contained the same federal claims raised in the California action, as well as a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c). But it omitted the California state-law claims and added claims for breach of contract and unjust enrichment under Pennsylvania law.

In the following months, the Pennsylvania District Court dismissed the RICO claims, denied a preliminary injunction after a hearing, set a discovery schedule, and ruled on several discovery motions. In August 2011, however, the Ninth Circuit, while finding that general personal jurisdiction over A1 was lacking, concluded that A1 was

5

subject to specific personal jurisdiction in California and reinstated the original action. CS then moved in Pennsylvania to dismiss the second-filed action or transfer it back to California for consolidation with the original filing. The Pennsylvania District Court denied the motion, noting the progress made in the Pennsylvania case and citing an earlier representation by CS's counsel that it intended to continue litigating in Pennsylvania no matter what happened in the then-pending appeal before the Ninth Circuit. The California District Court then stayed the California action pending resolution of the case in Pennsylvania.

In February 2012, A1 moved for summary judgment. The District Court heard oral argument on June 13, 2012. Several months later, in September 2012, CS moved to supplement the record with newly discovered evidence and to reopen discovery to further explore that source of evidence. The District Court denied the motion, noting that the evidence, which for the most part was found on CS's own servers, was in CS's control throughout the lawsuit and could have been found at any point during discovery. On October 25, 2012, the District Court granted A1's motion for summary judgment and entered judgment in favor of A1 on all claims. CS filed a timely notice of appeal.

II.

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have appellate jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's order granting summary judgment is plenary. *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 134 (3d Cir. 2013). We view the evidence "'in the light most favorable to

6

the nonmoving party.'" *Id.* at 134–35 (quoting *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 395 (3d Cir. 2010)).  Summary judgment is appropriate where the movant establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Insofar as the District Court dismissed the RICO claims as a matter of law, our review is de novo.

We review the District Court's denial of leave to amend the complaint for abuse of discretion.  *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (citations omitted).  The same is true for our review of the District Court's refusal to dismiss or transfer the action, *EEOC v. Univ. of Pa.*, 850 F.2d 969, 972 (3d Cir. 1988), as well as for our review of the District Court's decision to exclude evidence proffered after the expiration of a discovery deadline under Federal Rule of Civil Procedure 16(b), *Eichorn v. AT&T Corp.*, 484 F.3d 644, 650 (3d Cir. 2007).

### III.

### A.

CS's first argument is that in the aftermath of the Ninth Circuit's reversal on personal jurisdiction, the District Court should have granted its motion to dismiss this matter or transfer it to California under 28 U.S.C. § 1404(a).[1]  CS relies predominantly on the "first-filed" rule, which ordinarily counsels that in the event of duplicative federal

---

[1] That statute provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).

litigation, "the court which first has possession of the subject must decide it." *EEOC*, 850 F.2d at 971 (quotation marks and citations omitted). The rationale is to "encourage[] sound judicial administration and promote[] comity among federal courts of equal rank." *Id.* Yet we have consistently recognized exceptions to this equitable rule, including when a district court faces "rare or extraordinary circumstances, inequitable conduct, bad faith, or forum shopping." *Id.* at 972. The principles of comity and judicial efficiency underlying the rule have considerably less persuasive value where, as here, developments in the second-filed action have outpaced the initial suit. *Id.* at 976 (citations omitted). Finally, application of the first-filed rule at the insistence of the party filing essentially identical actions in multiple jurisdictions, like CS did here, may foster forum or judge shopping.

We conclude here that the District Court did not abuse its discretion when it declined to dismiss or transfer the instant lawsuit. Two factors stand out.

First, on August 15, 2011, when CS filed its motion to dismiss or transfer, the California district court had supervised only a brief period of jurisdictional discovery. The District Court here, by contrast, had actively managed the case for over a year, during which time it conducted a preliminary-injunction hearing, heard argument, denied the injunction, ruled on a motion to dismiss on substantive grounds, held two scheduling conferences, and permitted over two months of merits discovery. Granting the motion to dismiss or transfer at that stage would thus have resulted in the transfer of this complex

matter from a court already familiar with the facts and legal issues to one significantly less so.

Second, and perhaps more importantly, the District Court here undertook these efforts only "with the understanding that the parties would definitely proceed in this district," based on the fact that during a conference prior to scheduling the preliminary-injunction hearing, counsel for CS "declared its intention to go forward with litigating this case regardless of the outcome of the Ninth Circuit appeal in California." (App. 112–13, 119.) CS faults the District Court for "binding [CS] to an on-the-spot, informal, in-chambers, untranscribed response to a court question by one of [CS's] counsel (without consultation with [CS] and before any Ninth Circuit opinion had issued)." Appellant's Br. at 39. We have recognized, however, that such conferences are conducted in large part "'to define and simplify the issues, [and] to lessen surprise at trial and the risk of judicial error . . . .'" *Price v. Inland Oil Co.*, 646 F.2d 90, 96 (3d Cir. 1981) (quoting 3 Moore's Federal Practice 16.03). Here, the District Court was justified in holding CS to a representation made by its counsel on the fundamental issue of case management.[2]

---

[2] Additionally, the record reflects that the pre-hearing conference in this case was held on January 18, 2011. To the extent that counsel's comment was indeed an off-the-cuff and unintentional misrepresentation of CS's true position, we see no reason why it should not have been corrected over the seven months of active litigation prior to the Ninth Circuit's ruling in August 2011. Furthermore, to the extent that the Eastern District of Pennsylvania action was truly only a protective matter to guard against the running of the statute of limitations, CS could have asked the Pennsylvania federal court to stay that litigation pending the outcome of its appeal on the issue of personal jurisdiction. Instead,

9

In sum, we will affirm the District Court's order of October 28, 2011 insofar as it denied CS's motion to dismiss or transfer.

B.

CS also contests two of the District Court's rulings on matters related to scheduling and discovery. First, CS challenges the District Court's exclusion of a declaration by CS's Director of Operations, Stan Novak, dated April 5, 2012, and accompanied by over 1000 pages of documents described by the District Court as "voluminous spreadsheets" with "very little explanation." (App. 28.) CS disclosed those items for the first time as exhibits to its opposition to A1's motion for summary judgment, and it contends that they are merely summaries admissible under Federal Rule of Evidence 1006.[3] The District Court concluded that the declaration and accompanying

_____

it appears that CS sought to litigate this matter aggressively in Pennsylvania and then moved to return the case to California to avoid rulings adverse to it.

[3] Rule 1006 states:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

documents, which it regarded as "to a large extent incomprehensible," constituted untimely expert testimony and excluded them on that basis.[4]

CS now reiterates its position that the "documents summarized in the Summary were absolutely admissible, just presented in summary form." Appellant's Br. at 59. But where a proffered summary includes "assumptions" and "inferences" that "represent [the author's] opinion, rather than the underlying information," the evidence "is . . . subject to the rules governing opinion testimony." *Eichorn*, 484 F.3d at 650. Here, like the District Court, we are struck by the complexity of the proffered materials, the apparent discretion exercised by Novak in compiling the many charts included as exhibits, and the conclusory nature of what the purported "summaries" reveal. We conclude that the District Court did not abuse its discretion by categorizing these documents as belated expert submissions and excluding them on that basis.

---

[4] The District Court's original memorandum and order of September 25, 2012, granting summary judgment in favor of A1, did not address A1's then-pending motion to exclude Novak's April declaration. On November 7, 2012, after the filing of CS's notice of appeal, the District Court issued an order explaining that the Court had "inadvertently omitted" a footnote addressing the Novak declaration and amended its October 25, 2012 Memorandum and Order to include the omitted text. (App. 28.) CS argues that the District Court lacked jurisdiction at that point to amend its order. Federal Rule of Civil Procedure 60(a), however, expressly permits a district court to "correct a mistake arising from oversight or omission" at any time before an appeal "has been docketed in the appeal court." Here, the appeal was not docketed until November 15, 2012. Moreover, our Local Appellate Rules permit "a written amplification of a prior written . . . opinion" within 30 days of the docketing of a notice of appeal. L.A.R. 3.1. Because the District Court's timely amendment here was due to an oversight, and merely explains rather than revises its ruling on summary judgment, we see no error.

The second discovery ruling contested by CS pertains to the denial of its September 21, 2012 motion to supplement its filings and reopen discovery to introduce late-discovered evidence. The evidence is described in a second declaration by Novak, dated September 21, 2012, in which he details the discovery of records that, in CS's view, demonstrate that: (1) A1 and Noah "hacked into [CS's] server logging in, without authorization, via [CS's] paying subscribers' usernames/passwords"; (2) A1 "accessed [CS's] Website Terms of Use multiple times"; and (3) A1 "deleted over 88,000 electronic files from its server prior to its production in discovery to [CS] including files with very provocative names." Appellant's Br. at 51.

CS's motion to reopen discovery is governed by Federal Rule of Civil Procedure 16(b), which permits the court to modify a scheduling order "only for good cause." Fed. R.Civ. P. 16(b)(4).[5]

The evidence at issue here comes from two sources: CS's own servers, which of course it has had since the genesis of this litigation, and digital copies of A1's servers, which were produced in discovery in July 2011. The materials were thus in CS's possession for months and in some cases, years, before the discovery deadline. CS

---

[5] CS argues that the District Court should have analyzed its motion under Rule 6(b)(1)(B), which permits a court to extend a deadline for "an act [that] may or must be done within a specified time," where the moving party "failed to act because of excusable neglect." But the primary relief sought was the reopening of the discovery period, which would have allowed CS to serve the newly discovered evidence and explore it further. That demand places the motion squarely within the ambit of Rule 16(b). *See, e.g.*, *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 235 (3d Cir. 2007).

attributes its failure to discover the evidence to misleading disclosures or "obstruction of justice" by A1. Appellant's Br. at 57. But Novak concedes that he was able to discover the evidence, on his own, during a "spot check[]" of the data on August 2, 2012, while employing a search technique that was technologically feasible throughout A1's possession of the data. (App. 4827.) Novak then uncovered the remainder of the evidence over the following three weeks, again using search tools and methods that were available earlier. And crucially, despite having no apparent training or expertise in computer forensics, Novak states that he made the dubious decision not to enlist the help of CS's "computer expert," Michael Bandemer, in the company's review of these materials, which included roughly 1.6 billion server log entries and hundreds of gigabytes of data. (App. 4825.)

For these reasons, we conclude that CS is unable to show good cause for its failure to discover the materials at issue during the scheduled discovery window. Accordingly, the District Court did not abuse its discretion when it excluded the proffered evidence and declined to reopen discovery.

C.

CS next challenges the District Court's dismissal of Counts One and Two of the Amended Complaint, which assert civil violations of RICO. Those claims require a showing that a defendant conducted, or conspired to conduct, an enterprise through a pattern of racketeering activity, and that this activity was the proximate cause of an injury to the plaintiff's "business or property." 18 U.S.C §§ 1962(c) and 1964(c). A "pattern of

13

racketeering" consists of at least two acts of racketeering activity that are related and amount to, or pose a threat of, continued criminal activity. *Id.* § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). In a memorandum and order dated May 18, 2011, the District Court dismissed the RICO claims after concluding that CS had failed to allege two legally sufficient predicate acts.

CS asserts that three types of predicate acts were alleged, and we will address each in turn. First, the Amended Complaint asserts that A1 violated the National Stolen Property Act (NSPA), 18 U.S.C. § 2314, which makes it a crime to "transport[ ], transmit[ ], or transfer[ ] in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud[.]" Specifically, CS claims that A1 violated the NSPA when it received digital materials containing CS's marks from Noah, its Chinese subcontractor.

Federal courts have unanimously concluded, however, that the theft of intellectual property does not violate the NSPA. *See United States v. Aleynikov*, 676 F.3d 71, 73 (2d Cir. 2012); *United States v. Martin*, 228 F.3d 1, 14–15 (1st Cir. 2000); *United States v. Stafford*, 136 F.3d 1109, 1115 (7th Cir. 1998); *United States v. Brown*, 925 F.2d 1301, 1308 (10th Cir. 1991); *United States v. Zhang*, 995 F. Supp. 2d 340, 345–46 (E.D. Pa. 2014). All of these decisions rely on the Supreme Court's holding in *Dowling v. United States¸* 473 U.S. 207 (1985), where the Court rejected the Government's attempt to prosecute the interstate transport of bootlegged records under the NSPA. As the Court

14

recognized, § 2314, on its face, "seems clearly to contemplate a physical identity between the items unlawfully obtained and those eventually transported, and hence some prior physical taking of the subject goods." *Id.* at 216. And further, the "premise" of the statute—"the need to fill with federal action an enforcement chasm created by limited state jurisdiction"—has no obvious application with respect to the theft of copyrighted, patented, or other protected intangible materials, all of which could be prohibited by Congress without regard to whether the stolen items crossed state lines. *Id.* at 221. For these widely accepted reasons, we agree that the NSPA does not apply under these circumstances, and thus CS cannot offer its purported violation as a predicate act for purposes of the RICO claims.

Second, the Amended Complaint alleges obstruction of justice as a predicate act. The federal obstruction statute requires proof that the defendant "corruptly, or by threats or force, or by any threatening letter or communication, endeavor[ed] to influence, intimidate, or impede any . . . officer in or of any court of the United States . . . in the discharge of his duty . . . ." 18 U.S.C. § 1503(a). Under our case law, "only acts *directly* affecting parties, witnesses or jurors—and not other acts that may merely influence the proceedings—are cognizable" as predicate acts under RICO. *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 355 (3d Cir. 1986). Consequently, we have never recognized obstruction of justice as a viable RICO predicate except in cases involving witness intimidation. *See id.* (affirming District Court's dismissal of RICO allegations including destruction of evidence and subornation of perjury). Here, CS alleges only that

15

Moldoff obstructed justice by submitting false affidavits on the personal jurisdiction issue to the California District Court and by destroying electronic evidence related to this case. These allegations, even if true, are facially insufficient to establish a civil RICO violation.

The final predicate act alleged by CS is wire fraud, which requires "(1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme." *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012). The allegedly fraudulent communication here is the email from Moldoff to CS stating that A1 had "removed ALL course catalog PDF files" and would "honor [CS's] request and remove the content." (App. 3004.) CS argues that these statements were fraudulent because A1, despite removing the files from its website, preserved copies of the files on its servers and failed to weed out all CS documents during its initial review. But like the District Court, we conclude that these allegations "boil[] down to a disagreement about the meaning of" the statements, and "[t]his disagreement does not rise to the level of fraud[.]" *Lum v. Bank of Am.*, 361 F.3d 217, 226 (3d Cir. 2004).

In sum, we conclude that the Amended Complaint fails to allege any legally sufficient predicate acts for purposes of the RICO claims. Accordingly, we will affirm the District Court's order of May 18, 2011 dismissing Counts One and Two of the Amended Complaint.[6]

---

[6] CS also argues that the District Court erred by dismissing the RICO claims with prejudice, rather than allowing CS to file a second amended complaint. We have held

16

D.

Finally, CS challenges the District Court's grant of summary judgment on the merits as to six claims.[7] We will address the District Court's conclusions on a count-by-count basis.

### 1. Breach of Contract

Count Four of the Amended Complaint alleges that CS is entitled to damages for breach of contract by A1. Under Pennsylvania law, the main question "is whether both parties have manifested an intention to be bound by [the contract's] terms and whether the terms are sufficiently definite to be specifically enforced." *EBC, Inc. v. Clark Bldg. Sys., Inc.,* 618 F.3d 253, 263 (3d Cir. 2010) (citations omitted). CS presents three arguments in support of its claim that A1 breached a contract here.

First, CS argues that A1 entered into a contract with CS when it created trial accounts for CollegeSource Online. A1 concedes that to create those accounts, it

---

that "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245–46 (3d Cir. 2008). At the same time, leave to amend may be denied in non-civil-rights cases where the moving party fails to submit a draft amended complaint. *See Fletcher-Harlee Corp. v. Pote Concrete Constrs., Inc.*, 482 F.3d 247, 252–53 (3d Cir. 2007). Although the District Court improperly failed to explain the reasoning behind its denial of leave to amend here, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), CS likewise failed to submit a draft amended complaint. Accordingly, we decline to grant relief on this basis.

[7] Because CS's briefing makes no specific reference to the District Court's grant of summary judgment on Count Eight, in which CS sought a declaration of trademark invalidity, we will affirm it summarily.

17

consented to the Subscription Agreement, which prohibits the commercial use of documents acquired as a result of the trial subscription. Accordingly, CS has established that a contractual relationship (albeit a limited one) existed between the parties. But as noted by the District Court, CS presents no evidence that A1 downloaded any of CS's course catalogs pursuant to those trial subscriptions, and consequently is unable to prove that A1 breached the Subscription Agreement.

Second, CS seizes on A1's admission that some of the documents included by A1 in its initial database were obtained from the websites of schools that subscribed to CataLink. According to CS, those documents, too, are covered by the Subscription Agreement—the same Agreement that A1 consented to when its employees created the aforementioned trial accounts. The Agreement, by its own terms, "govern[s] [the] use of CollegeSource Online, TES, and, unless other terms and conditions expressly govern, any other electronic services from CollegeSource, Inc. that may be available from time to time[.]" (App. 2773.)

We agree with the District Court that a user of CollegeSource Online could not have reasonably interpreted the Agreement to cover the attenuated scenario in which that same user obtains a course catalog from a link embedded in the website of a third-party college that happened to be a CataLink subscriber. And the Subscription Agreement itself uses the term "service" in ways inconsistent with Catalink's characteristics—for instance, by referring to the "Help section" of a service, which CataLink does not have, and by noting that individuals access "services" with a user name and password, neither

18

of which CataLink requires. (*Id.*) Accordingly, the record contains no basis on which to conclude that A1 breached the Subscription Agreement when it accessed course catalogs through CataLink.

Third, CS argues that A1, regardless of how it obtained the digital files bearing CS's marks, was bound by the Copyright and Disclaimer, which CS refers to as the "Catalog Terms of Use." In CS's view, the mere viewing of that document bound A1 to its terms—most importantly, the requirement that A1 not use the appended materials for a commercial purpose. The Copyright and Disclaimer, however, explicitly identifies itself not as a contract, but as a declaration of *copyright*, and purports to describe the parties' respective entitlements—i.e., what the viewer "may" and "may NOT" do. Accordingly, the fact that A1 accessed documents containing CS's data and read the Copyright and Disclaimer therein would not allow a jury to find the formation of a contract between the parties.

Thus, because CS has failed to produce evidence that A1 breached any contract with CS, we will affirm the District Court's grant of summary judgment in favor of A1 on Count Four.

2. **Unjust Enrichment**

Count Five of the Amended Complaint charges that A1 was unjustly enriched by reproducing and redistributing course descriptions belonging to CS. The District Court concluded that this state-law claim was preempted by the existence of a federal remedy under the Copyright Act, which grants a copyright owner the exclusive right to

19

reproduce, prepare derivative works based upon, distribute, perform, and display the copyrighted material at issue. *See* 17 U.S.C. § 106. Section 301 of the Copyright Act, *id.* § 301(a), provides that state law is expressly preempted where the elements of the claim at issue are the same as those required for an infringement claim under § 106. *See Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 217 (3d Cir. 2002)). By contrast, "if a state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display, then . . . federal law will not preempt the state action." *Id.*

Under Pennsylvania law, a plaintiff bringing a claim for unjust enrichment "must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985) (quotation marks and citation omitted). "In order to recover, there must be both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied." *Id.* (quotation marks and citations omitted). The burden is on the plaintiff to prove damages "to a reasonable degree of certainty." *Temple Univ. Hosp., Inc. v. Healthcare Mgm't Alts., Inc.*, 832 A.2d 501, 310 (Pa. Super. Ct. 2003) (citing *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861 (Pa. 1988)).

Federal courts have routinely held that claims of unjust enrichment are pre-empted under § 106 where the claim rests on an allegation that the defendant has secured a benefit due to the plaintiff under the Copyright Act. *See, e.g.*, *R.W. Beck, Inc. v. E3 Consulting, LLC*, 577 F.3d 1133, 1149 (10th Cir. 2009). The situation presented here,

20

however, is that CS disavows any claim of copyright over the materials at issue, and concedes that it would *not* have a remedy against A1 under the Copyright Act. *See* Appellant's Reply Br. at 30–31. Consequently, according to CS, its claim of unjust enrichment is not duplicative of a claim under § 106, and thus is not preempted under § 301(a).

Assuming this to be correct, we will nonetheless affirm the District Court's ruling because we conclude that A1 is entitled to summary judgment on the merits of the claim. CS has established that A1's nascent database contained materials that required a significant financial investment for CS to compile. But the record also reflects that A1, upon being notified of the transgression, undertook extensive efforts to purge the materials from its database. CS provides no evidence that A1 profited directly or indirectly from the use of those materials. These facts preclude a finding that an injustice would result if recovery is denied. And further, CS has failed to provide any evidence upon which to make a finding of damages for purposes of this claim, let alone to a reasonable degree of certainty.

Accordingly, we will affirm the District Court's grant of summary judgment in favor of A1 on Count Five of the Amended Complaint.

### 3. **Computer Fraud and Abuse Act**

Count Three of the Amended Complaint alleges that A1 is liable under the CFAA, which generally addresses criminal behavior but also provides that victims may be entitled to compensatory damages in a civil suit. 18 U.S.C. § 1030(g). Specifically, CS

makes four claims: that A1 (1) "intentionally accesse[d] a computer without authorization or exceed[ed] authorized access," and thereby obtained information, *id.* § 1030(a)(2)(C); (2) "knowingly and with intent to defraud, accesse[d] a protected computer without authorization, or exceed[ed] authorized access, and by means of such conduct further[ed] the intended fraud and obtain[ed] anything of value," *id.* § 1030(a)(4); (3) "intentionally accesse[d] a protected computer without authorization, and as a result of such conduct, recklessly cause[d] damage," *id.* § 1030(a)(5)(B); and (4) "intentionally accesse[d] a protected computer without authorization, and as a result of such conduct, cause[d] damage and loss," *id.* § 1030(a)(5)(C). The parties agree that CS's servers are "protected computers" within the meaning of the statute.

Common to all of CS's claims under the CFAA is the requirement of proof that the defendant accessed information "without authorization" or "exceed[ed] authorized access." A person "exceeds authorized access" when he "access[es] a computer with authorization and . . . use[s] such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." *Id.* § 1030(e)(6). The root term, however—"authorization"— is not defined by the statute, and has been the subject of robust debate. One point of agreement is that "without authorization" should be given its "common usage, without any technical or ambiguous meaning." *United States v. Morris*, 928 F.2d 504, 511 (2d Cir. 1991); *see also LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132–33 (9th Cir. 2009). Here, the record contains only limited evidence that A1

22

accessed CS's servers, and such access was not "without authorization" under any common meaning of that term.

First, A1 acknowledges that at least two of its employees created trial accounts for CollegeSource Online, using a process available to the general public. There is no evidence, however, that those employees downloaded catalogs for commercial use in violation of the Subscription Agreement, hacked into technologically sequestered portions of the database, or even so much as viewed any particular document. The record would therefore not support a jury finding that A1 violated the CFAA in this respect.

Second, A1 concedes that some course catalogs in its initial offering were obtained from links embedded on the web pages of schools that subscribe to CataLink. These materials were available without precondition to any member of the general public who clicked the link on the subscribing school's website and was thereby directed to CS's servers.[8] Thus again, A1 obtained the materials in question without breaching any technological barrier or contractual term of use.[9] CS provides no other evidence that A1's use of CataLink was "without authorization." Accordingly, we will affirm the

---

[8] As noted above, we have already concluded that the mere presence of the Copyright and Disclaimer in the documents at issue did not create a contract between CS and the viewer, and did not give rise to any unilateral imposition of terms on the documents' use.

[9] CS further argues that the District Court failed to draw certain inferences in CS's favor based on the contents of Novak's April declaration and the attached exhibits. *See* Appellant's Br. at 63. Because we have affirmed the District Court's exclusion of that evidence, CS's arguments are unavailing insofar as they rely upon it.

District Court's order insofar as it granted summary judgment in favor of A1 on Count Three.

### 4. **Trademark Infringement and Unfair Competition under the Lanham Act**

Counts Six and Seven of the Amended Complaint state claims under the Lanham Act, 15 U.S.C. §§ 1114 and 1125. These claims center on A1's purchase of targeted online advertising offered by search-engine companies, commonly known as "AdWords." Under that method of advertising, when a user enters any of a set of specified search terms, the user receives not only their search results but also an ad from the purchaser. In this instance, A1 paid Google to display ads for "www.collegetransfer.net," an A1 offering, when the user searched for terms including "college source," and "collegesource." (App. 2427–28.)

To succeed on a claim for trademark infringement or unfair competition under the Lanham Act, CS must prove that: (1) it owns the mark at issue; (2) the mark is valid and legally protectable; and (3) A1's use of the mark is likely to create confusion. *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001). The first two elements here are not in dispute. The District Court thus properly focused on the "likelihood of confusion" element by applying the test we adopted in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983), drawing additional guidance from the Ninth Circuit's recent holding in *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1148–54 (9th Cir. 2011).

The District Court's careful analysis on this point concluded that the strength of CS's mark was outweighed by: (1) the lack of evidence of actual confusion; (2) the expected savviness of internet users seeking out college-transfer information; and (3) the distinct labeling of Google's advertisements. On that basis, the Court found no likelihood of consumer confusion that would support a claim for trademark infringement. We agree with the District Court's factual findings and legal conclusions on this point, and see no need to reiterate the same analysis in further detail. Accordingly, we will affirm the District Court's grant of summary judgment on Counts Six and Seven.

5. **False Advertising under the Lanham Act**

Count Nine of the Amended Complaint asserts that A1 engaged in false advertising under the Lanham Act, 15 U.S.C. § 1125, first when it represented the contents of its catalog database as current, reliable, and accurate, (App. 1706–10), and second when Moldoff, A1's president, emailed colleges in July 2010 with the statement that CS regarded itself as the owner of the course catalogs in its database and was aggressively pursuing lawsuits containing "copyright claims" against competitors, (App. 565). The elements of a false advertising claim include:

> 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

25

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (quoting *Warner-Lambert v. Breathasure*, 204 F.3d 87, 91–92 (3d Cir. 2000)). The District Court granted summary judgment on each of these claims after concluding that CS had failed to introduce evidence upon which a jury could conclude that the statements were literally false or that they had a tendency to deceive.

CS challenges the District Court's ruling first as to the currentness of A1's database by citing Novak's April 2012 declaration, in which he ostensibly demonstrates that a large portion of A1's course catalogs pertain to past academic sessions and may not reflect current offerings. But for the reasons expressed above, we affirmed the District Court's exclusion of that declaration and the accompanying documents. Accordingly, we will affirm the District Court's ruling that CS has failed to raise a genuine dispute of material fact on this point.

CS also presses its claim that A1 made false representations in the email of July 30, 2010, which Moldoff sent to various colleges across the country. Specifically, CS takes issue with Moldoff's statements that CS was "claiming ownership" of the course catalogs at issue by filing "copyright claims" in the Eastern District of Pennsylvania. (App. 565.) CS contends that this mischaracterizes its legal challenges because CS is not bringing copyright claims and does not claim ownership of the underlying course-catalog data.

Like the District Court, we conclude that Moldoff's letter, viewed in light of CS's aggressive prosecution of its alleged statutory and contractual rights, was at worst

ambiguous regarding its description of the instant legal action. At the time of the letter, CS had sued or threatened to sue A1 under the Copyright Act, the Lanham Act, RICO, the CFAA, the California Computer Crimes Act, the California Business and Professions Code, and the contract law of both Pennsylvania and California. Many of these claims are predicated at least in part on CS's position that users of its services are bound by the Copyright and Disclaimer included in each of its documents, which asserts entitlements under the Copyright Act and claims ownership of the "digital catalogs" at issue. Thus, because a jury could not reasonably conclude that Moldoff's letter was false or misleading, we will affirm the entry of summary judgment on Count Nine.

## IV.

For the foregoing reasons, we will affirm the District Court's orders of May 18, 2011, October 28, 2011, and October 25, 2012.